**Joan A. McGAHAN, Rusty H. Seaman, Appellants,**

**v.**

**STATE of Alaska, Appellee.**

**Nos. A–2939, A–2962.**

Court of Appeals of Alaska.

March 15, 1991.

Suzanne Weller, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant McGahan.

Leslie A. Hiebert, Asst. Public Advocate, and Brant McGee, Public Advocate, Anchorage, for appellant Seaman.

---

Valerie A. VanBrocklin, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, District Court Judge.[*]

## OPINION

ANDREWS, Judge.

Joan A. McGahan and Rusty H. Seaman were convicted upon their pleas of no contest to one count of misconduct involving a controlled substance in the fourth degree—possession with intent to deliver or manufacture marijuana—a class C felony. AS 11.71.040(a)(2). They preserved their right to appeal the superior court's denial of their motions to suppress under *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974). McGahan and Seaman were each sentenced to three years of incarceration.

In this consolidated appeal, McGahan and Seaman contend that Superior Court Judge Mark C. Rowland erred by denying their motion to suppress because the canine sniff of their warehouse was a search requiring a warrant under article I, sections 14 and 22 of the Alaska Constitution. Furthermore, they argue that if the canine sniff results are suppressed, there was no probable cause to issue the search warrant for their warehouse. Third, they claim that since the fruits of the warehouse search provided probable cause to search their homes and vehicles, the marijuana confiscated from these places should also be suppressed. Finally, McGahan and Seaman assert that their sentences are excessive.

On April 22, 1988, a canine sniff was conducted on a warehouse belonging to McGahan and Seaman. The dog, Irma, alerted to the presence of controlled substances. Based in part on the alert, law officers sought a warrant to search the warehouse. Superior Court Judge Victor D. Carlson issued a warrant authorizing the search of the warehouse. When the warrant was executed, police found $25,000 worth of growing equipment, including lights, timers, a dumbwaiter, irrigation equipment, scales, generators, dryers, and drying racks. The warehouse also contained over one-hundred mature marijuana plants which were three to six feet tall and yielded a harvest of over 163 pounds. Thirty-seven marijuana seedlings and five pounds of dried and packaged marijuana were also found.

Based on the items found at the warehouse, officers obtained a warrant authorizing the search of McGahan's and Seaman's residences. While searching McGahan's house, police found two pounds of marijuana. Police confiscated three pounds of marijuana in a truck outside of Seaman's residence.

The police became aware of a possible marijuana growing operation when Helmut G.W. Engelke informed Investigator James P. Meehan of his observations in September or October of 1987. At the first search warrant hearing, Engelke testified that he had owned and operated a cabinet making shop in Anchorage for twelve years. In July or August of 1987 McGahan and Seaman purchased the warehouse which had been next to Engelke's shop for at least ten years. Until the winter of 1986–87, the warehouse had been occupied by Alaska Offshore Industries, Incorporated. When this company moved from the building, Engelke contacted First National Bank, owner of the warehouse, to ask about purchasing the building. Engelke believed he had an agreement regarding the purchase of the warehouse with the bank.

One day Engelke noticed a man taking down the "FOR SALE" sign by the warehouse. Puzzled that the building had sold when he thought he had agreed to purchase it, Engelke called the bank loan officer. Engelke asked the officer what business the new owners operated. The officer did not tell Engelke the new owners' business, stating simply that the new owners had wanted to purchase the building.

At the warehouse warrant hearing, Engelke testified that the new owners were quick to make several major changes to the

---

[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

building. According to Engelke, the new owners blacked out every window.[1] They also chained a sign across the exterior stairway which warned to "keep off" or "keep out" and posted a "PRIVATE" sign on a door. The building was modified so that its occupants could go from the first to the second floor without using the exterior stairway. Three air intake canisters and two ventilators were built into the roof of the warehouse. A plywood cubicle enclosure was built in the garage and allowed only one car or truck to enter. The enclosure also blocked any view of the inside of the warehouse. In addition to the changes made by the new owners, a person from Chugach Electric Company replaced the old meters with larger ones which were apparently capable of measuring more electric use. Despite the extensive changes to the warehouse, the new owners never took down the sign which advertised the building as the location of Alaska Offshore Industries, Incorporated.

Engelke also testified to facts suggesting that the occupants were not operating a legitimate business. Engelke never saw anyone coming to do business with the occupants. The only vehicles Engelke saw at the warehouse were the owners' personal vehicles.[2] Although it was winter, Engelke noticed that the warehouse was very hot inside. He also observed, however, that the furnace did not appear to be running. The gas furnace did not emit steam, yet steam came off of the roof. The appellants' roof appeared to have no snow, whereas, the neighbors' roofs had three to four feet of snow.

He stated the new owners were unfriendly and did not want to talk to him. The occupants did not answer the door on at least one occasion when Engelke knew they were inside.

Meehan testified at the warehouse warrant hearing that Engelke had related his observations to him. Meehan spent several hours observing the building during normal business hours. No traffic entered or exited the warehouse. Meehan observed that all the windows in the warehouse were painted black.[3] He observed one of the usual occupants brush Engelke aside after he attempted to converse with the occupant. The building was still advertised as the business location for Alaska Offshore Drilling, Incorporated. Meehan saw a lot of moisture on the inside of a particular window. Meehan verified Engelke's report that there was an "unusual lack of snow on the building, on the roof and around the building walls." In fact, Meehan noticed that the temperature of the warehouse was so warm that snow several inches from the warehouse had melted. After Meehan discussed his observations with some drug officers, he believed that the warehouse was being used to grow marijuana.

Trooper Allen Storey testified at the first warrant application hearing that he conducted the canine sniff of the warehouse at the request of Meehan. Storey took police canine Irma to the front of the warehouse. He testified that there was a "public parking area that ha[d] access right onto the street." Storey took Irma into the public parking area and placed her in the "down" position. He touched door knobs and windows along the front part of the building to pre-scent the area. He shook the door knobs and found that they were locked. Storey then commanded Irma to search for the presence of controlled substances.

Irma started sniffing from the east to west along the front of the building. She sniffed the cracks by the doors and next to the windows as she crossed the front of the building. She came to the door marked

1. As McGahan and Seaman point out, Engelke's testimony that the owners blacked out all of the windows was inaccurate. Only the first story windows were blacked out. The upstairs windows were either clear or covered with curtains.

2. When the new owners first moved into the warehouse, four different vehicles came to the building. The cars apparently belonged to a lady (McGahan), her boyfriend, and her two

sons. According to Engelke, the cars were at the warehouse almost every day until Christmas. For two or three weeks after Christmas, only the woman came to the warehouse. Thereafter, the woman and one other person visited the warehouse.

3. As noted earlier, only the first-story windows were blackened.

"PRIVATE" by the west end of the building, and "alerted" that she had detected the odor of a controlled substance at the lower right side of the doorway.

Storey testified that under his direction, Irma had searched for the odor of controlled substances 574 times. She alerted to the presence of controlled substances on 490 occasions. The places where Irma alerted were subsequently searched and resulted in the discovery of controlled substances 483 times.

Three weeks after the canine sniff, law officers sought a warrant authorizing a search of the warehouse. Judge Carlson granted the warrant, finding probable cause based in part on the canine search.

Judge Rowland held an evidentiary hearing on the defendants' motion to suppress. At the suppression hearing, Meehan and Storey testified that the warehouse did not appear to be used for residential purposes. Storey testified that the warehouse had no facilities for garbage collection and he had not seen lights on upstairs, nor personal items in windows or around the building. Meehan never saw anyone present at the warehouse in the evenings and had confirmed that McGahan and Seaman resided elsewhere. Although Meehan found items which suggested that the people may have rested and eaten upstairs during the day, there were no personal effects in the bathroom and the unit was not set up for overnight use. One bedroom had a mattress, but the mattress was heaped with clothes.

Judge Rowland denied the motion to suppress. He found that the unit on top of the warehouse was not used as a residence, but was used as part of the business. He further concluded that the officers' impression that the unit was not used as a residence was reasonable. With respect to the

dog sniff, Judge Rowland concluded that the results were reliable and the search was appropriate. Finally, Judge Rowland stated that McGahan and Seaman had no reasonable expectation of privacy in the land exterior to the parking lot and the building. The area up to the building was open to the public. The sign on the stairwell simply indicated that there was no access to the stairs on the exterior of the building. The private sign on the door simply meant that one should knock before entering. The existence of the signs did not indicate that the public was refused access to the parking lot or land exterior to the building.

In *Pooley v. State,* 705 P.2d 1293, 1311 (Alaska App.1985), this court held that "exposure of luggage to a drug detection dog is a search under the Alaska Constitution...." Since a sniff of luggage is a search under the Alaska Constitution, a sniff of the exterior of a commercial building is likewise a search. *See e.g., United States v. Whitehead,* 849 F.2d 849, 854 (4th Cir.1988) ("[T]he Supreme Court has consistently re-affirmed that the privacy interests of individuals engaged in transit on public thoroughfares are substantially less than those that attach to fixed dwellings.").

 McGahan and Seaman assert that *Pooley* does not exempt the police from obtaining a warrant before a sniff of a residence or a business is performed. Appellants argue that the police should not have performed the sniff until they had obtained a warrant based on probable cause.

The trend is to find warrantless canine sniffs constitutionally permissible because either: 1) they are not considered searches since non-contraband items are not revealed;[4] or 2) a police officer's reasonable

---

**4.** The federal courts appear to uniformly hold that a canine sniff of a person's luggage is not a search for constitutional purposes. *See United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *United States v. Teslim,* 869 F.2d 316 (7th Cir.1989) (court did not explicitly hold that sniff was not a search but appeared to concur with *Place*); *United States v. Beale,* 736 F.2d 1289 (9th Cir.1984); *United States v. Waltzer,* 682 F.2d 370 (2nd Cir.1982); *United States v. Goldstein,* 635 F.2d 356 (5th Cir.1981).

Several cases hold that a dog sniff of something other than luggage is not a search. *United States v. Vasquez,* 909 F.2d 235 (7th Cir.1990) (sniff of garage from public alley); *United States v. Colyer,* 878 F.2d 469 (D.C.Cir.1989) (dog sniff of sleeper compartment in train); *United States v. Mayomi,* 873 F.2d 1049 (7th Cir.1989) (dog sniff of mail); *United States v. Dicesare,* 765 F.2d 890 (9th Cir.1985), *amended on other grounds,* 777 F.2d 543 (1985) (dog sniff

suspicion is an exacting enough standard to allow the sniff given the minimal intrusion occasioned by this investigative technique.[5]

In *Pooley*, 705 P.2d at 1311, while this court held that exposing luggage to a dog sniff is a search under the Alaska Constitution, we added that it is

a minimally intrusive type of search, akin to an investigative stop and frisk under *Terry*, which may be used when police have a reasonable suspicion that drugs may be present in the container and that drugs are being illegally imported to the state or are being illegally possessed for distribution.

This court thus concluded that the police need not obtain a warrant based on probable cause before a dog sniff of a person's luggage could be conducted. *Id. See also State v. Garcia*, 752 P.2d 478, 480 (Alaska App.1988).

McGahan and Seaman assert that the exigent circumstances which justified a search or seizure on less than probable cause in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (to assure the safety of the police officer), and in *Pooley*, 705 P.2d 1311 (to find mobile contraband), are not present in this case. They claim that absent these exigencies the police need a warrant based on probable cause to conduct a canine sniff.

This argument, however, fails to recognize that minimally intrusive searches and seizures constitute an exception to the warrant requirement. *Cf. Hayes v. State*, 785 P.2d 33, 37 (Alaska App.1990) (despite a lack of *Terry* exigencies, police can detain based on a reasonable suspicion that arrest warrants have been issued, if detention is only a minimal intrusion). With respect to

canine sniffs, Professor Wayne R. LaFave comments that even

[a]ssuming now that *some* uses of these dogs constitutes a search, it does not inevitably follow that they should be encumbered by the restrictions ordinarily applicable to other types of searches which are clearly more intrusive in character.... Although there are sound reasons for not employing too generously "a graduated model of the fourth amendment," the notion that searches by use of dogs trained to detect narcotics or explosives is a lesser intrusion subject to lesser Fourth Amendment restrictions is sound. This is because this particular investigative technique is a distinct police practice which quite obviously is much less intrusive than other searches.

W. LaFave, 1 *Search and Seizure* § 2.2(f) at 375 (2d ed. 1987) (footnotes omitted).

Only one case reviewed by this court required a warrant based on probable cause before a canine sniff could be deemed constitutional. *United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir.1985). In *Thomas*, the court held that the "heightened expectation of privacy" in one's dwelling renders a canine sniff of the outside of the apartment door a search. *Id.*

*Thomas* is distinguishable since Judge Rowland found that the upstairs of the warehouse was not in fact used as a residence and the officers' conclusion that the warehouse was not a residence was reasonable.

As evidenced by the number of opinions which hold that a sniff is not even a search, Alaska's more stringent protection of its citizens' privacy interests can still be assured if the reasonable suspicion standard is applied to canine searches of areas of

---

of car trunk); *Horton v. Goose Creek Independent School District*, 690 F.2d 470 (5th Cir.1982) (sniff of student lockers in public hallways and cars in public lots); *United States v. Venema*, 563 F.2d 1003 (10th Cir.1977) (dog sniff of air outside storage locker); *United States v. Sklar*, 721 F.Supp. 7 (D.Mass.1989) (canine sniff of mail); *People v. Dunn*, 155 A.D.2d 75, 553 N.Y. S.2d 257 (1990) (dog sniff of exterior of apartment); *State v. Quatsling*, 24 Ariz.App. 105, 536 P.2d 226 (1975) (dog sniff of commercial storage facilities).

**5.** *See Whitehead*, 849 F.2d at 857 (court acknowledged that sniff of luggage is not a search but also agreed with district court that police needed reasonable suspicion before a dog sniff could be conducted inside defendant's train roomette); *United States v. Solis*, 536 F.2d 880, 883 (9th Cir.1976) (court never explicitly decided whether sniff of defendant's semi-trailer at gas station was a search, but held that the sniff "was not unreasonable under the circumstances").

public access exterior to commercial buildings. *See* 1 W. LaFave, *Search and Seizure* § 2.2(f) at 372 (2d ed. 1972) (requiring police to have an "independent reasonable suspicion" before conducting canine searches reduces the likelihood that dogs will make false alerts).

"Whether reasonable suspicion exists is a mixed question of fact and law." *Hayes*, 785 P.2d at 36. The trial court's factual findings should not be reversed unless they are clearly erroneous. *Id.* However, "[w]hether the circumstances of a case justify a finding of reasonable suspicion is an issue which is subject to *de novo* review." *Id.* (citation omitted). Although Judge Rowland never decided whether reasonable suspicion existed to conduct the search, given his factual findings in this case, this court can exercise its independent judgement. *See Dye v. State*, 650 P.2d 418, 420 n. 5 (Alaska App.1982).

"A reasonable suspicion is one that has some factual foundation in the totality of the circumstances observed by the officer in light of the officer's knowledge." *Gutierres v. State*, 793 P.2d 1078, 1080 (Alaska App.1990) citing *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). "Reasonable suspicion may be based on an informant's tip." *Dionne v. State*, 766 P.2d 1181, 1183 (Alaska App. 1989) (citing *Adams v. Williams*, 407 U.S. 143, 147–48, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972)). Where the informant is a citizen, he is treated by the court as presumptively reliable. *Id.* (citing *Erickson v. State*, 507 P.2d 508, 517 (Alaska 1973)).

Meehan and Storey clearly had reasonable suspicion to conduct the sniff of the warehouse. They received a tip from citizen informant Engelke that the new owners of the warehouse did not behave as legitimate business people. Engelke's credibility had not been challenged. Furthermore, Engelke and Meehan observed that the building was unusually hot. Meehan also noticed the collection of moisture on a window. The renovations to the building were consistent with ones which would be needed to grow marijuana in the warehouse. Although McGahan and Seaman suggest that these facts fail to indicate that the business was illegitimate, because heat and moisture are consistent with any tropical plant business, this argument fails to recognize that they went to great expense to keep anyone from finding out the nature of their business and had no visitors during business hours. The owners of a lawful plant business would be unlikely to take expensive and extreme precautions to hide the nature of their business. In addition, legitimate businesses generally have visitors.

In conclusion, the officers only needed reasonable suspicion to use a reliable dog to conduct a canine sniff of the warehouse exterior which was accessible to the public. The officers clearly met the reasonable suspicion standard.

### EXCESSIVE SENTENCE CLAIM

■ McGahan's and Seaman's final argument is that their three-year sentences are excessive.

McGahan was fifty-two-years-old when sentenced. She had no criminal history. She had committed two traffic offenses: one in 1984 and the other in 1988. McGahan graduated from high school with average grades. She held an Alaska real estate license from 1980 until it was revoked due to the current offense. She worked as a realtor until her license was revoked. She reported earning $55,000 in 1984 and $66,000 in 1985. Before she became a realtor, she had managed a store, worked as a chef, and owned and operated her own restaurant and fish market. McGahan was not married at the time of the offense. She had four grown children and was a grandmother.

Judge Rowland remarked that nothing on the report or histories indicated that McGahan was "physically, emotionally, intellectually, socially, or in any way impaired and unable to make her way in the world. No such impediment compelled her to the choice of this commercial venture." The court concluded that rehabilitation was not an important consideration in this case, stating he did not know anything that

"would assist the defendant." The important considerations according to the court were deterrence of McGahan, deterrence of others, and community condemnation.

Seaman, McGahan's son, was thirty-years-old at the time of the offense. Seaman had no criminal record, although he had thirteen traffic offenses beginning in 1978 until his latest, which occurred while he was on release in the present case. Seaman graduated from high school with average grades. Seaman had been self-employed as a commercial fisherman in the summer and a carpenter in the winter from 1977 through 1988. He had been employed as a carpenter from September, 1988, until January, 1989, at a wage of $12 an hour. Seaman has been married since 1982. He and his wife have three children ranging in age from one to six years.

The court stated it did not know how Seaman could be rehabilitated. The court remarked:

> I don't know how we can rehabilitate this defendant. What needs to be done? He needs no counseling that I know of that I can at least see any need for. Has no dependence—dependencies which require attention medically or through counseling. He needs no vocational training that I can see. I don't know what we would do for Mr. Seaman in the way of rehabilitating him in the usual sense of the word.... I don't think he probably needs isolation.

The court remarked that deterrence of Seaman, deterrence of others, and reaffirmation of societal norms required a substantial sentence that is "exactly equivalent to the sentence imposed in his mother's case." Judge Rowland rejected Seaman's argument that he was less culpable than McGahan, since he committed the offense only after prompting from his mother.

According to the state, McGahan's and Seaman's operation was the largest marijuana growing business ever discovered by the Anchorage Police Department. Police confiscated over one-hundred mature marijuana plants which yielded over 163 pounds of marijuana. The street value of the harvest was $407,500.[6] Thirty-seven marijuana starter plants were seized, as were eight pounds of drying marijuana. According to the state, many stripped plants were found indicating an earlier harvest.

During the search of McGahan's residence, police found two pounds of marijuana worth $5,000. Police found three pounds of marijuana worth $7,500 in a truck at Seaman's residence. At Seaman's sentencing, the court accepted the representation that there was no indication that Seaman possessed or owned the truck in which the marijuana was found.

McGahan and Seaman assert that their three-year sentences exceed the benchmark in *Austin v. State*, 627 P.2d 657 (Alaska App.1981). They claim that the case should be remanded since Judge Rowland did not make the findings necessary to deviate from the *Austin* limit.

McGahan and Seaman are first felony offenders:

> Normally a first offender should receive a more favorable sentence than the presumptive sentence for a second offender. It is clear that this rule should be violated only in an exceptional case. However, it is also clear that the legislature did not intend to say that a first offender could never receive more time to serve than the presumptive sentence for a second offender, since the statute easily could have been written to accomplish that result.

*Id.* at 657–58. The presumptive sentence for a second felony offender violating a class C felony is two years. AS 12.55.-125(e)(2). The presumptive sentence for a third felony offender violating a class C felony is three years. AS 12.55.125(e)(3). The state contends that the sentences do not violate *Austin* since this case is exceptional given the size of the operation and the amount of marijuana confiscated.

---

**6.** McGahan questioned the state's assessment of the street value of the marijuana but did not provide an alternative estimate.

When deciding whether exceptional circumstances warrant departure from *Austin,* it is appropriate for the court "to determine whether any of the aggravating factors specified in AS 12.55.155(c) apply to the case...." *Peetook v. State,* 655 P.2d 1308, 1310 (Alaska App.1982). Alaska Statute 12.55.155(c)(25) allows a court to aggravate a sentence when "the defendant is convicted of an offense specified in AS 11.71 and the offense involved large quantities of a controlled substance." Judge Rowland remarked at McGahan's sentencing that the offense involved the "growing of large amounts of marijuana for commercial purposes." He concluded that "[t]he amounts, as have been described here, are somewhat extraordinary. At least for the history of commercial operations involving marijuana in this state." Judge Rowland found that McGahan's offense "was a reasonably sophisticated growing operation for commercial purposes [W]hich involved an investment of substantial capital ... and the employment of substantial expertise."

Several cases involving the distribution of marijuana indicate that the amount of marijuana possessed by McGahan and Seaman was exceptional. *See Snyder v. State,* 585 P.2d 229 (Alaska 1978) (sixty-seven kilograms of marijuana); *Wolfe v. State,* 553 P.2d 472, 473 (Alaska 1976) (nearly ninety pounds of marijuana); *Fleener v. State,* 686 P.2d 730, 736–37 (Alaska App.1984) (1,830 grams of marijuana and 420 grams of hashish); *Poggas v. State,* 658 P.2d 796 (Alaska App.1983) (Poggas sold nearly six pounds; Winfield, another appellant, sold six pounds). Furthermore, McGahan's and Seaman's offense is exceptional given the amount of commercial investment the parties put into their growing operation. The warehouse contained over $25,000 worth of growing equipment, was purchased with a $40,000 down payment, and required extensive renovation. Given the amount of marijuana involved, and the sophistication of this business, Judge Rowland's sentence was not clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

Seaman's contention that he should be sentenced more leniently than his mother is without merit. Seaman's claim that he got involved in the offense at the urging of his mother should not mitigate his sentence. Seaman, a thirty-year-old adult, was capable of making an independent decision.

The judgment of the superior court is AFFIRMED.