**STATE of Minnesota, Respondent,**

v.

**Andre Lashon CARTER, Appellant.**

**No. A03–1215.**

Supreme Court of Minnesota.

June 9, 2005.

John M. Stuart, State Public Defender, Theodora Karin Gaitas, Assistant Public Defender, Rachel Foster Bond, Special Assistant Public Defender, Faegre & Benson, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, and Susan Gaertner, Ramsey County Attorney, Darrell C. Hill, Assistant Ramsey County Attorney, St. Paul, MN, for Respondent.

## OPINION

HANSON, Justice.

In this appeal from a conviction of unlawful possession of a firearm, we consider what level of suspicion must precede police use of a drug-detection dog to sniff outside a bank of storage units within a fenced self-storage facility. The district court denied the motion of appellant Andre Lashon Carter to suppress the evidence of a firearm discovered when police, acting pursuant to a search warrant that was based in large part on the results of a dog sniff, searched his rented storage unit. The court of appeals affirmed, holding that the dog sniff was not a "search" because appellant had no expectation of privacy in the "semi-public" area outside his unit. Although we conclude that the dog sniff was not a "search" within the meaning of the Fourth Amendment to the United States Constitution, we hold that the dog sniff was a "search" within the meaning of Article I, Section 10 of the Minnesota Constitution. Because the governmental interest in the use of drug-detection dogs to aid law enforcement is significant, we hold that a dog sniff is an unreasonable search unless police have at least reasonable, articulable suspicion of criminal activity before conducting it. And because the police did not have such suspicion here, and there was no

probable cause to issue the warrant without the results of the dog sniff, we reverse appellant's conviction and grant a new trial.

On June 10, 2002, a Saint Paul police officer arranged for a drug-detection dog to "sniff" outside a bank of storage units within a fenced self-storage facility. The dog sniff at Secure Mini Storage occurred approximately 4 weeks after a Minnesota Bureau of Criminal Apprehension (BCA) agent had observed what he believed to be suspicious activity at the facility. According to the agent, a white car bearing no license plates had entered the facility, left, and then re-entered as the female driver stared at police officers who were dressed in "raid gear." The agent believed that the driver was scouting or surveying the officers. The agent also observed that a blue sports-utility vehicle left the fenced storage facility at the same time as the white car.[1] The SUV displayed license plates registered to appellant's brother, Benjamin Carter.

The agent relayed information about his suspicions to a Saint Paul police officer, who recognized Benjamin Carter's name from a drug-related investigation. The Saint Paul officer then consulted with Secure Mini Storage's manager, who said that Benjamin Carter and appellant each rented two units at the facility and sometimes visited their units several times a day. The Saint Paul officer then arranged for the June 10, 2002, dog sniff, apparently after securing permission from the facility's management to enter the fenced area immediately outside of appellant's units. The dog indicated that a controlled substance was inside one of those units.

Later that day, the Saint Paul officer applied for two search warrants—one for appellant's storage unit, the other for his home. The warrant applications did not identify the Secure Mini Storage manager by name, did not specify the dates when the manager was interviewed or when the BCA agent observed the suspicious activities, and did not explain why 4 weeks had elapsed between the suspicious activities and the sniff. The applications did allege that the Carters were gang members and had prior convictions for drug offenses— two convictions for appellant in 1995 and 1997, and one for Benjamin in 1995. The applications also indicated that appellant had been convicted of possessing a pistol without a permit in 1995, and had three arrests, apparently not resulting in convictions, in 1994 and 1998. The warrant applications also referenced four arrests for Benjamin Carter from 1998 to 2001. Finally, as to the dog sniff, the applications stated that a dog "certified at narcotics detection * * * [had] indicated the presence of controlled substance from storage locker # 2504," which was one of the units appellant rented.

A Ramsey County district judge signed the search warrant for the storage unit, authorizing seizure of, among other things, controlled substances and firearms; the judge also signed the search warrant for appellant's home, authorizing seizure of "keys which may be used to facilitate the distribution of controlled substances," financial records, documents, mail, and gang-membership indicia.

The next day, police officers first executed the warrant at appellant's home and seized a clear bag with a substance sus-

---

1. Search warrant applications filed in connection with this case do not specify that the vehicles entered and/or departed the facility at the same time. But at a district court hearing on appellant's motion to suppress evi- dence seized pursuant to the warrants, the affiant officer testified that he was told that the vehicles had left the storage facility "together."

pected to be cocaine, a scale, $692 in currency, undeveloped film, a can of Mace, and various keys and documents. Appellant was arrested at his home and taken to the Ramsey County jail. Later that morning, police officers executed the warrant at appellant's storage unit, where they seized two firearms, ammunition, and a nylon bag containing a stocking hat. No drugs were found.

Based on the firearms and ammunition seized from the storage unit, appellant was charged with illegal possession of a firearm under Minn.Stat. § 624.713, subds. 1(b) and 2, and § 609.11, subd. 5(b) (2004).[2] He brought a motion to suppress the firearms and ammunition, arguing that police officers lacked the suspicion required to conduct a dog sniff outside his storage unit and, without the results of the dog sniff, lacked probable cause to support the warrant. Appellant cited *State v. Wiegand*, 645 N.W.2d 125 (Minn.2002), where we held that a police officer performing a traffic stop for a routine equipment violation must have reasonable, articulable suspicion of drug-related criminal activity before using a drug-detection dog to sniff the automobile's exterior.

The district court denied the motion to suppress, ruling that the results of the dog sniff, appellant's criminal record, and his alleged frequent visits to the storage facility provided the "substantial basis" for probable cause needed to support a search warrant. *See, e.g., State v. McBride*, 666 N.W.2d 351, 360 (Minn.2003) (court reviewing another magistrate's issuance of search warrant ensures "that the court had a substantial basis for concluding that probable cause existed"). The district court did not rule on whether probable cause existed apart from the results of the

dog sniff. On April 21, 2003, appellant was convicted and sentenced to 60 months in prison.

The court of appeals affirmed appellant's conviction. The court held that the reasonable suspicion requirement in *Wiegand* did not apply because it was confined to situations where police officers attempt to "expand the scope or duration of an investigative stop beyond the investigation of an equipment violation that was the cause for the stop." *State v. Carter*, 682 N.W.2d 648, 652 (Minn.App.2004). The court concluded that appellant had no reasonable expectation of privacy in the "semi-public" area immediately outside the storage unit and, therefore, that the dog sniff in that area was not a search.

We granted review on the issue of what level of suspicion must precede a drug-detection dog sniff of an area outside a self-storage unit.

## I.

First, we examine whether evidence other than the results of the dog sniff provided a substantial basis for probable cause supporting the warrant for the storage-unit search. If there was independent probable cause, we would affirm appellant's conviction and save the constitutional questions concerning the dog sniff for another day. *State v. Hoyt*, 304 N.W.2d 884, 888 (Minn.1981) (deferring the constitutional issue because conviction was reversed on other grounds); *In re Senty–Haugen*, 583 N.W.2d 266, 269 n. 3 (Minn. 1998) ("It is well-settled law that courts should not reach constitutional issues if matters can be resolved otherwise.").

When examining whether a search was supported by probable cause,

---

2. Appellant also was charged with possession with intent to sell a controlled substance under Minn.Stat. § 152.022, subds. 1(1) and 3(b) (2004). Neither that charge nor circumstances of the search warrant for appellant's home are part of this appeal.

the ultimate question is whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). A district court's decision to issue a search warrant is reviewed for "whether the issuing judge had a substantial basis for concluding that probable cause existed." *State v. Rochefort,* 631 N.W.2d 802, 804 (Minn.2001). Because we examine the totality of the circumstances, "a collection of pieces of information that would not be substantial alone can combine to create sufficient probable cause." *State v. Jones,* 678 N.W.2d 1, 11 (Minn.2004). Nonetheless, in examining the issuing judge's basis for finding probable cause, we look only to information presented in the affidavit and not to information that the police possessed but did not present in the affidavit to determine whether there were "specific facts to establish a direct connection between the alleged criminal activity and the site to be searched." *State v. Souto,* 578 N.W.2d 744, 749 (Minn.1998).

The application for the search warrant for the storage units listed three factors besides the results of the dog sniff to support probable cause for the search: (1) appellant's criminal record, (2) a BCA agent's observations and suspicions from approximately 4 weeks earlier, and (3) a statement from the Secure Mini Storage manager regarding appellant's rental of and frequent visits to his storage units.

■ A person's criminal record is among the circumstances a judge may consider when determining whether probable cause exists for a search warrant. *See United States v. Conley,* 4 F.3d 1200, 1207 (3d Cir.1993), *cert. denied,* 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994). Courts also occasionally consider arrests not resulting in conviction, as when the arrest "involves a crime of the same gener-

al nature as the one which the warrant is seeking to uncover." *Id.* But a criminal record, even a "long" one, is best used as "corroborative information" and not as the sole basis for probable cause. *See State v. Conaway,* 319 N.W.2d 35, 41 (Minn.1982). Convictions that are several years old are less reliable in providing a "fair probability" that contraband will be found in a place to be searched. *See State v. Blacksten,* 507 N.W.2d 842, 847 (Minn.1993) (stating that a 7–year–old conviction for robbery did not support probable cause for search in connection with current robbery).

■ Appellant's most recent conviction, on May 1, 1997, was for possession of a controlled substance with intent to distribute. It occurred more than 5 years before the search warrant application. Appellant had one other drug-related conviction, in 1995, for possessing cocaine. His other conviction on April 17, 1995, was for possessing a pistol without a permit. In 1998, he was arrested for possessing cocaine and possessing a firearm as a felon, but he was not convicted of the charges. On October 6, 2001, a Saint Paul police officer, investigating gunshots fired at a gas station, stopped appellant's vehicle but did not arrest him. Taken as a whole, we conclude that appellant's criminal record does not provide probable cause for the search of the storage unit for drugs and weapons.

■ Next, we examine the BCA agent's observations and suspicions from 4 weeks before the search warrant application. The application for the storage-unit warrant failed to specify that the two vehicles considered suspicious by the BCA agent either entered or left the storage facility together. After appellant was charged, the Saint Paul police officer who signed the application for the search warrant testified at a *Rasmussen* hearing that he had been told by the BCA agent that the vehi-

cles left "together," but that testimony is irrelevant to our analysis because it was not known by the judge at the time the warrant was issued. *See State v. Rosenthal,* 269 N.W.2d 40, 42 (Minn.1978). We conclude that the BCA agent's suspicions do not provide probable cause.[3]

Finally, we examine the storage facility manager's statement as to appellant's rental of and frequent visits to his storage units. Statements from citizen witnesses may provide a basis for probable cause when the witness is credible. *Jones,* 678 N.W.2d at 11; *State v. Siegfried,* 274 N.W.2d 113, 115 (Minn.1978). In addition, the "freshness of the information" provided by the witness is an important factor for determining the probability that contraband or evidence of a crime will be found in a particular place. *Souto,* 578 N.W.2d at 747.

Assuming that the manager's observations are reliable, it is unclear whether the information she provided regarding appellant's frequent trips to his storage units was "fresh." The application for the search warrant did not state when the manager provided the information or when appellant was observed to have frequently visited the storage facility. Further, there was no explanation in the warrant application as to why 4 weeks elapsed between the BCA agent's initial suspicions and the application for the search warrant. Finally, there may be many legitimate reasons to visit a storage unit frequently. Without more, the mere fact of frequent visits to a storage unit does not provide evidence of the "fair probability" that contraband is inside. *See Gates,* 462 U.S. at 238, 103 S.Ct. 2317.

As we have said, our totality-of-the-circumstances approach permits us to find probable cause among several factors when one factor standing alone does not provide a substantial basis for supporting a search warrant. *Jones,* 678 N.W.2d at 11. Still, there must be a "direct connection" between the factors and the site to be searched. *Souto,* 578 N.W.2d at 747. We cannot say that appellant's criminal record, the report of his frequent visits to his storage units, and his relationship with his brother provide a connection supporting probable cause to search his storage unit.

We hold that if the results of the dog sniff are excluded from the application for the search warrant, the remaining statements do not provide a "substantial basis" for probable cause supporting issuance of the warrant. Accordingly, we must necessarily determine the issue of whether the results of the dog sniff could be used to support the application for a search warrant.

II.

We next consider whether a dog sniff outside a self-storage unit is a search under the Fourth Amendment to the United States Constitution. The Fourth Amendment ensures "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The right arises only when a person has a legitimate expectation of privacy in the place in question. *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct.

---

3. We also note that the stares from the driver of the white car can be innocently explained by the unusual experience of seeing police officers in "raid gear" near a self-storage facility. In addition, there was no nexus linking the suspicious vehicles or their drivers to any criminal activity involving appellant. His "mere association" with his brother, whose car was observed at the facility, is not enough to support probable cause. *Blacksten,* 507 N.W.2d at 847.

2476, 53 L.Ed.2d 538 (1977). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the United States Supreme Court suggested that the question of whether a dog sniff is a search depends in part on the level of the person's expectation of privacy in the place where the dog sniff occurs, and in part on the level of intrusiveness of the dog sniff. The Court held that because a traveler's expectation of privacy in a public airport is limited, and a trained drug-detection dog sniff is only minimally intrusive, a dog sniff of a traveler's luggage in a public place was not a search under the Fourth Amendment. 462 U.S. at 707, 103 S.Ct. 2637. The Court acknowledged that a person has a reasonable expectation of privacy in luggage *contents*, but held that there is no such expectation in scents that may be detected at the luggage's *exterior*. *Id.*[4]

As for the intrusiveness of a dog sniff, the Supreme Court observed that a dog sniff "discloses only the presence or absence of narcotics." *Id.* A dog sniff was described as "*sui generis*" because there is "no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Id.* This reliance on the limited intrusiveness of a drug-detection dog sniff was reaffirmed in *City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S.Ct. 447,

148 L.Ed.2d 333 (2000), where the Court held that a dog sniff of a vehicle at a traffic checkpoint was not a search because it "does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics."

We employed the *Place–Edmond* rationale in *Wiegand* where we held that a drug-detection dog sniff of a vehicle stopped for a routine equipment violation was not a search under the Fourth Amendment. 645 N.W.2d at 131. We concluded that significant governmental regulation of automobiles and the fact that automobiles generally do not "serve as the repository of personal effects," meant that the driver of an automobile has a limited expectation of privacy in the automobile. *Id.* (citing *South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) and *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974)).

*Place* and *Edmond* were decided before *Kyllo v. United States*, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), where the warrantless use of a thermal-imaging device on a home suspected of containing heat-emitting lamps commonly used to grow marijuana was held to be a search in violation of the Fourth Amendment. *Kyllo*, 533 U.S. at 40, 121 S.Ct. 2038. Appellant argues that *Kyllo* effectively overruled *Place* and *Edmond*. Appellant also suggests that a drug-detection dog is similar to the "sense-enhancement technology * * * not in general public use" that was

---

4. In *Wiegand*, we also noted that, for Fourth Amendment purposes, the question of whether a dog sniff is a search depends in part on the level of the expectation of privacy. We said:

The Court [referring to *Place*] explicitly limited its ruling to the exposure of luggage in an airport, a public place, to a dog sniff,

which suggests the possibility that a dog sniff under different circumstances might be treated differently. Indeed, the analysis of permissible searches and seizures necessarily requires consideration of the particular privacy interests in the place or item to be searched.

*Wiegand*, 645 N.W.2d at 130.

held impermissible in *Kyllo*, in part because the technology provided details that "previously have been unknowable without physical intrusion." *See Kyllo*, 533 U.S. at 34, 121 S.Ct. 2038. But we rejected the same arguments in *Wiegand*, where we observed that a thermal imager is "a piece of technical equipment much different from a dog." *Wiegand*, 645 N.W.2d at 130. We also distinguished *Kyllo* because it involved a home, where a person's expectations of privacy are most heightened. We observed:

> While *Kyllo* involved both the home and a piece of technical equipment much different from a dog, its reasoning suggests that a dog sniff of a home might lead a court to conclude that a search requiring probable cause took place.

*Wiegand*, 645 N.W.2d at 130.

Recently, in *Illinois v. Caballes*, 543 U.S. ——, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005), the Supreme Court confronted a situation similar to that in *Wiegand*. The Court emphasized its view that a drug-detection dog sniff is only minimally intrusive, deciding that the dog sniff of a vehicle lawfully seized on a public roadway " 'generally does not implicate legitimate privacy interests' " under the Fourth Amendment because it "does not expose noncontraband items that otherwise would remain hidden from public view." *Caballes*, 125 S.Ct. at 838 (quoting *United States v. Place*, 462 U.S. at 707, 103 S.Ct. 2637). The Court specifically determined that *Kyllo* is "en-

tirely consistent" with *Place*. *Caballes*, 125 S.Ct. at 838. The Court observed that while a heat-sensory device is "capable of detecting lawful activity" inside a house, a dog sniff "reveals no information other than the location of a substance that no individual has any right to possess." *Id.* The Court clarified that the relevant inquiry is whether the investigative device used is capable of detecting lawful as well as unlawful activity inside a place that otherwise carries a legitimate expectation of privacy. *Id.*

The Supreme Court has not addressed the precise question presented here, whether a drug-detection dog sniff outside of a storage unit is a search under the Fourth Amendment. All of the state and lower federal court decisions that have addressed that issue have concluded that a dog sniff outside a storage unit is not a search under the Fourth Amendment.[5] Those courts generally rely on two factors—that one who rents a storage unit has a limited expectation of privacy in the area immediately outside that unit and that a dog sniff for contraband is of limited intrusiveness. For example, in *People v. Wieser*, the Colorado Supreme Court held that a dog sniff outside a storage unit "does not expose noncontraband items that otherwise would remain hidden from public view." 796 P.2d 982, 985 (Colo.1990). In *State v. Slowikowski*, the Oregon Supreme Court also held that a dog sniff outside a storage unit is not a search be-

---

5. *See United States v. Lingenfelter*, 997 F.2d 632, 639 (9th Cir.1993); *United States v. Venema*, 563 F.2d 1003, 1007 (10th Cir.1977); *State v. Quatsling*, 24 Ariz.App. 105, 536 P.2d 226, 228 (1975), *cert. denied*, 424 U.S. 945, 96 S.Ct. 1416, 47 L.Ed.2d 352 (1976); *People v. Wieser*, 796 P.2d 982, 985 (Colo.1990); *State v. Slowikowski*, 307 Or. 19, 761 P.2d 1315, 1320 (1988); *Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74, 78 (1987); *Strout v. State*, 688 S.W.2d 188, 191 (Tex.Ct.App.1985); *see also McGahan v. State*, 807 P.2d 506, 509–

11 (Alaska Ct.App.1991) (recognizing the trend in federal courts to find that dog sniffs are not searches, but resolving the question solely under state constitution); *Smith v. State*, No. 01–02–00503–CR, 2004 WL 213395, at *3–*4 (Tex. Ct.App. Feb. 5, 2004), *rev. denied* (Tex. Sept. 15, 2004) *and cert. denied*, —— U.S. ——, 125 S.Ct. 1726, 161 L.Ed.2d 602 (2005) (holding that a drug-detection dog sniff outside a garage door at a home was not a search under the Fourth Amendment).

cause the odors detected "were all entirely outside the locker, where anyone who tried could have detected them." 307 Or. 19, 761 P.2d 1315, 1320 (1988). Appellant has not cited a case in which a dog sniff outside a self-storage unit was held to be a search under the Fourth Amendment, nor has our research revealed one.

Appellant argues that the privacy interest in a self-storage unit is greater than that in an automobile and is comparable to that in a home. We agree that the privacy interest in an area outside a fixed structure such as a storage unit is greater than that outside a mobile but temporarily stopped automobile. Unlike an automobile, a storage unit is not subject to substantial governmental regulation and is designed specifically for the purpose of storing personal effects in a fixed place. *Compare Wiegand,* 645 N.W.2d at 131. In addition, appellant's privacy interest at the time of the dog sniff was perhaps greater than in *Wiegand,* where the motorist already had been stopped for lawful reasons.

But we conclude that the expectation of privacy under the Fourth Amendment is less for a storage unit than for a home. *See, e.g., State v. Carter,* 569 N.W.2d 169 (Minn.1997) (holding that a police officer who left a sidewalk, climbed over bushes and peered through a gap in a home's blinds to observe drug-related activity performed search under Fourth Amendment), *rev'd on other grounds,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). Under the rationale followed in *Kyllo* and *Caballes* for purposes of the Fourth Amendment, a person's expectation of privacy in a storage unit is limited because the unit is

not a place where a person seeks refuge or conducts frequent personal activities. *Compare State v. Larsen,* 650 N.W.2d 144, 149 (Minn.2002) (holding that warrantless entry into ice-fishing house violated Fourth Amendment because the structure is "erected and equipped to protect its occupants from the elements and often provid[es] eating, sleeping, and other facilities").

■ Our interpretation of the decisions of the Supreme Court and of the other courts that have considered the question leads us to conclude that a drug-detection dog sniff in the area immediately outside a self-storage unit is not a search under the Fourth Amendment.

### III.

■ Appellant urges us to hold that a dog sniff outside a self-storage unit is nevertheless a search under Article I, Section 10 of the Minnesota Constitution,[6] which is textually identical to the Fourth Amendment to the United States Constitution. In the alternative, he asks us to extend the holding of *Wiegand* to storage units, to require that police officers have a reasonable, articulable suspicion of criminal activity before performing a dog sniff. We note that *Wiegand* concluded that the dog sniff was not a search but that reasonable, articulable suspicion was required because the vehicle had been "seized" in the traffic stop. *Wiegand,* 645 N.W.2d at 133, 135. In the absence of a seizure, the protections of Article I, Section 10 of the Minnesota Constitution do not extend to appellant unless we determine that the dog sniff was a search. Accordingly, we must determine whether there are significant reasons why

6. "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized." Minn. Const. art. 1, § 10.

the definition of a search should be broader under the Minnesota Constitution than we perceive it to be under the United States Constitution.

We are free to offer protections under the Minnesota Constitution that are greater than those under the United States Constitution. *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). But we will not do so cavalierly. *Wiegand,* 645 N.W.2d at 132. Because language used in the Fourth Amendment and Article I, Section 10 of the Minnesota Constitution is identical, we consider the decision of the Supreme Court to be of "inherently persuasive, although not necessarily compelling, force." *Wiegand,* 645 N.W.2d at 132.[7]

Courts in Pennsylvania and Alaska have examined the question that we confront and have determined that, although the dog sniff of a storage unit was not a search under the Fourth Amendment to the United States Constitution, it was a search under the comparable provisions of their state constitutions. *Commonwealth v. Johnston,* 515 Pa. 454, 530 A.2d 74, 78–79 (1987); *McGahan v. State,* 807 P.2d 506, 510 (Alaska Ct.App.1991) (extending previous holding that a dog sniff of luggage was a search under state constitution). These courts relied in part on persuasive arguments by Professor Wayne R. LaFave, who cautions against "totally unrestrained" use of dogs in law enforcement because of the growing recognition that dogs can provide "false alerts." *Johnston,* 530 A.2d at 79 (citing 1 Wayne R. LaFave, *Search and Seizure* § 2.1(e), at 315 (2d ed.1987)); *McGahan,* 807 P.2d at 510–11 (citing 1 LaFave, § 2.2(f), at 372).

We are persuaded by the decisions of the courts in Alaska and Pennsylvania and our own Minnesota constitutional precedents that there are good reasons to guard against a police officer's random use of a drug-detection dog to sniff in the area immediately outside of a person's storage unit, absent some level of suspicion of drug-related activity. We reach this conclusion by considering the strength of the expectation of privacy in a self-storage unit and the degree of intrusiveness of a drug-detection dog sniff in the area immediately outside that unit.

We conclude that a person's expectation of privacy in a self-storage unit is greater for the purpose of the Minnesota Constitution than it has been determined to be under the Fourth Amendment. This is particularly true of storage units like ap-

7. We have recognized that a citizen's protection against seizures may be greater under article I, section 10, than under the Fourth Amendment. In the case of *In re Welfare of E.D.J.,* 502 N.W.2d 779, 783 (Minn.1993), we reiterated that a person facing contact with a police officer is "seized" when he feels that he is not free to leave, departing from a Supreme Court decision to the contrary in *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). A year later, we departed from *Michigan Dep't of State Police v. Sitz;* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), which permitted police officers to use temporary roadblocks to seek out drunken drivers, when we held that the state had failed to prove why we should depart from the long-held policy in Minnesota that police generally must have "objective individualized articulable suspicion of criminal wrongdoing *before* subjecting a driver to an investigative stop." *Ascher v. Comm'r of Pub. Safety,* 519 N.W.2d 183, 187 (Minn.1994). In *State v. Fort,* we again applied Article I, Section 10 of the Minnesota Constitution to hold that police officers may not expand the scope of a routine traffic stop beyond the underlying justification for the stop without reasonable suspicion of criminal activity beyond the traffic offense. 660 N.W.2d 415, 419 (Minn.2003). And most recently, in *State v. Askerooth,* 681 N.W.2d 353 (Minn.2004), we held that a squad-car detention and a police officer's request for consent to search were an unlawful seizure that exceeded article I, section 10 protections. *Askerooth,* 681 N.W.2d at 367, 371.

pellant's that are equivalent in size to a garage and are large enough to contain a significant number of personal items and even to conduct some personal activities. Unlike an automobile or luggage, the dominant purpose for such a unit is to store personal effects in a fixed location.

We are mindful that a person's expectation of privacy in a self-storage unit does not extend to that which can be plainly seen or smelled from the area immediately outside the unit. But we consider the smell of that area to be "plain" only if a person is capable of detecting it. Stated another way, a renter of such a unit must expect that other people will lawfully be in the area outside the unit and will be able to smell plain odors emanating from the unit. But the renter need not expect that police will be able to bring to that area drug-detecting dogs that can detect odors that no person could detect. Such dogs do not enable a police officer to smell the odor, but instead, as in *Kyllo*, provide information to the police officer that was "previously * * * unknowable without physical intrusion." *Kyllo*, 533 U.S. at 40, 121 S.Ct. 2038.

We conclude that the sniff of a drug-detection dog outside appellant's storage unit was a search for purposes of the Minnesota Constitution.[8]

## IV.

The conclusion that a dog sniff outside a self-storage unit is a search under the Minnesota Constitution requires us to consider what level of police suspicion is required before such a search will be considered reasonable when made without a warrant. Although the typical standard for suspicion necessary to support a warrantless search is probable cause to believe

that a crime has been committed, we are persuaded by the reasoning of other courts and legal scholars that the standard of reasonable, articulable suspicion should also be considered in the process of balancing a person's privacy interests against the public's interest in effective criminal investigations.

The Alaska and Pennsylvania courts both have adopted a reasonable, articulable suspicion standard for the deployment of drug-detecting dogs to sniff outside a storage unit. In *McGahan*, the Alaska Court of Appeals held that "Alaska's more stringent protection of its citizens' privacy interests can still be assured if the reasonable suspicion standard is applied to canine searches of areas of public access exterior to commercial buildings." 807 P.2d at 510–11. Similarly, the Pennsylvania Supreme Court held that requiring police officers to articulate "reasonable grounds" before undertaking a dog-sniff search of a storage unit presents a workable constitutional "middle ground" that balances a person's expectation of privacy against the government's interest in using dogs to detect illegal drugs. *Johnston*, 530 A.2d at 79. We commend the Pennsylvania court's observation that

> [o]n the one hand, much of the law enforcement utility of such dogs would be lost if full blown warrant procedures were required before a canine sniff could be used; but on the other, it is our view that a free society will not remain free if police may use this, or any other crime detection device, at random and without reason.

*Id.*

We recognize that the government has a significant interest in the use of drug-

---

8. We specifically limit our decision to sniffs of drug-detecting dogs. We express no opinion regarding bomb-detection dogs, as to which

the special needs of law enforcement might well be significantly greater.

detection dogs in aid of law enforcement. For that reason, we adopt the holding of the Pennsylvania Supreme Court:

[A] narcotics detection dog may be deployed to test for the presence of narcotics [in the area outside a storage unit] where:

1. the police are able to articulate reasonable grounds for believing that drugs may be present in the place they seek to test; and

2. the police are lawfully present in the place where the canine sniff is conducted.

*Id.*

Because police did not articulate reasonable suspicion that drugs were present in appellant's storage unit, we hold that the deployment of a drug-detection dog was an unreasonable search under the Minnesota Constitution; that the evidence resulting from the dog sniff was unlawfully obtained and must be suppressed; that the application for a warrant to search the storage unit was not otherwise supported by probable cause; and that, accordingly, the evidence seized during the search of the storage unit was unlawfully obtained and must be suppressed. Because the error in admitting the seized evidence was prejudicial to appellant, we reverse his conviction and remand for a new trial.

Reversed and remanded.

ANDERSON, G. BARRY, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

Concurring specially, PAGE, J. and BLATZ, C.J.

Dissenting, ANDERSON, RUSSELL A., J.

Took no part, ANDERSON, G. BARRY, J.

PAGE, Justice (concurring specially).

I concur in the result reached by the court, but write separately to voice my disagreement with the court's holding that the police need only reasonable, articulable suspicion before conducting a dog sniff outside a storage unit. As articulated in my special concurrence in *State v. Wiegand,* 645 N.W.2d 125, 137–40 (Minn.2002), I believe that probable cause, instead of reasonable, articulable suspicion, is the proper standard for dog sniff cases. In *Wiegand,* the location of the dog sniff was a motor vehicle. Here, it was the outside of a storage unit within a secure facility. Obviously, the privacy interest is more prominent in this case. As the court notes, "the privacy interest in an area outside a fixed structure such as a storage unit is greater than that outside a mobile but temporarily stopped automobile." Given this more prominent privacy interest, a search warrant based on anything less than probable cause impermissibly erodes the protections of Article I, Section 10, of the Minnesota Constitution. *State v. Pietraszewski,* 285 Minn. 212, 216, 172 N.W.2d 758, 762 (1969) ("A search warrant may be granted only upon a showing of probable cause 'supported by oath or affirmation.' ").

BLATZ, Chief Justice (concurring specially).

I join in the special concurrence of Justice Page.

ANDERSON, Russell A., Justice (dissenting).

DISSENT

I respectfully dissent. I would affirm the conviction, concluding that the information contained in the search warrant affidavit, including the dog sniff, provided

a substantial basis for the issuing judge to conclude that there was probable cause to search the storage unit.

We do not " 'cavalierly construe our constitution more expansively than the United States Supreme Court has construed the federal constitution.' " *State v. Askerooth,* 681 N.W.2d 353, 362 (Minn. 2004) (quoting *State v. Fuller,* 374 N.W.2d 722, 726–27 (Minn.1985)). This is particularly true where, as here, the two constitutional provisions are textually identical. *Fuller,* 374 N.W.2d at 727. Except for two other states, we are alone in construing the state constitution to mean that a dog sniff in the semi-public area outside a self-storage unit constitutes a search. All courts that have considered the issue have concluded that under the Fourth Amendment, no search occurs in this circumstance. These decisions are based on *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), in which the United States Supreme Court held that the exposure of luggage to a trained drug-detection dog at an airport did not constitute a search within the meaning of the Fourth Amendment. We recently held that a dog sniff around the exterior of a legitimately stopped motor vehicle is not a search requiring probable cause under either the Fourth Amendment or Minn. Const. art. I, § 10. *State v. Wiegand,* 645 N.W.2d 125, 133 (Minn. 2002). In so holding, we found no sound basis for rejecting the United States Supreme Court's approach, noting that *Place* "was not a radical or sharp departure from precedent." 645 N.W.2d at 132.

The Fourth Amendment and Minn. Const. art. I, § 10, protect a person's legit-imate expectations of privacy against unreasonable government intrusions. *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *In re Welfare of B.R.K.,* 658 N.W.2d 565, 578 (Minn.2003). A legitimate expectation of privacy is, in the words of Justice Harlan, "one that society is prepared to recognize as 'reasonable.' " *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). *Rakas v. Illinois,* 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *State v. Licari,* 659 N.W.2d 243, 249 (Minn.2003). Justice Harlan later suggested, and the leading commentator on search and seizure law agrees, that the question whether reliance upon privacy is legitimate or reasonable "must * * * be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement." *United States v. White,* 401 U.S. 745, 786, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting); 1 Wayne R. LaFave, *Search and Seizure* § 2.1(d), at 440 (4th ed.2004). Under this approach, "those more extensive intrusions that significantly jeopardize the sense of security which is the paramount concern of Fourth Amendment liberties are searches." (citing *United States v. White,* 401 U.S. at 786, 91 S.Ct. 1122). This approach involves a two-part inquiry: (1) what "sense of security" is important in our society, and (2) whether the police investigative practice threatens that sense of security. *Id.* at 440–43.[1]

Applying this fundamental approach to what constitutes a legitimate expectation of privacy protected by the constitutional

---

**1.** We recently used similar language in holding that under Minn. Const. art. I, § 10, the reasonableness test involves "a balancing of the government's need to search or seize 'and the individual's right to personal security free from arbitrary interference by law officers.' " *Askerooth,* 681 N.W.2d at 365 (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).

proscription against unreasonable searches and seizures, I would conclude that the use of a trained drug-detection dog outside Carter's storage unit did not constitute a search. As the renter, Carter doubtless had a legitimate expectation of privacy in the storage unit itself. *See Licari,* 659 N.W.2d at 250. We are concerned, however, with whether Carter had a legitimate expectation of privacy in the air outside the unit, in a semi-public walkway. The expectation-of-privacy analysis "necessarily requires consideration of the particular privacy interests in [that] place." *Wiegand,* 645 N.W.2d at 130.

The area where the dog sniff was conducted is a semi-public walkway that is accessible to renters of other storage units, the management of the facility, and individuals there by consent. Carter had no ability to limit their access to and use of the walkway, and he has not questioned the legitimacy of police presence there. Additionally, Carter was at the unit only periodically, and he obviously did not live there. I fail to see what "sense of security," or legitimate expectation of privacy, Carter might possibly have had in the air in the semi-public area outside his storage unit.

It is not enough to say that the privacy interest in a storage unit is heightened because it is designed as a repository for personal effects. The same is true of luggage and the trunk of an automobile, and once they are immobilized, a dog sniff of them does not constitute a search under *Place* and *Wiegand.* A stopped vehicle additionally implicates the privacy interests of its occupants, and persons, no less than their effects, are constitutionally protected from unreasonable searches.

The majority implies that Carter had a legitimate expectation of privacy outside his storage unit on indications that drug-detection dogs may be more fallible than previously supposed. Whether a particular dog has unacceptably high error rates should go to probable cause for issuance of a search warrant, not an individual's expectation of privacy in a particular place. *See* LaFave, *supra,* § 2.2(g), at 533 (if dogs are not as accurate as assumed in *Place,* this bears not so much on the question whether a dog's sniffing is a search as it does on the question whether a dog's alert standing alone constitutes probable cause for warrant); *Illinois v. Caballes,* ― U.S. ――, 125 S.Ct. 834, 838, 160 L.Ed.2d 842 (2005) (no suggestion that erroneous alert, in and of itself, reveals any legitimate private information). Whether fallible or not, dog sniffs still constitute a limited intrusion, revealing nothing else inside the structure that might implicate a legitimate expectation of privacy.

Quoting *Kyllo v. United States,* 533 U.S. 27, 34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), the majority also bases its holding on the ground that drug-detection dogs provide information that was "previously unknowable without physical intrusion." *Kyllo,* however, involved a thermal-imaging device that could detect lawful activities within a home in which individuals have an obviously legitimate expectation of privacy. By contrast, a dog sniff is limited to revealing only the presence of contraband. Because any interest in possessing contraband is not one that society considers legitimate, a sense-enhancing technique that only reveals the presence of contraband " 'compromises no legitimate privacy interest.' " *Caballes,* 125 S.Ct. at 837 (quoting *United States v. Jacobsen,* 466 U.S. 109, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). As the Supreme Court stated in *Caballes:* "Critical to [the *Kyllo*] decision was the fact that the device was capable of detecting lawful activity— in that case intimate details in a home

* * *. The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from [a person's] hopes or expectations concerning the nondetection of contraband * * *." *Caballes,* 125 S.Ct. at 838.

I am also concerned over what today's decision portends for "plain smell" observations made in public or semi-public areas generally. Examples include the use of bomb-detection dogs to sniff for explosives, and humans detecting the odor of a decaying body or a methamphetamine laboratory. Under the approach taken by the majority, an individual may have a legitimate expectation of privacy in a particular space for some purposes but perhaps not for others, and the police and lower courts are provided little guidance in determining whether a particular intrusion into that space constitutes a "search" or not under the Minnesota Constitution.

Additionally, we need to be mindful that except in very limited circumstances, the Fourth Amendment and Minn. Const. art. I, § 10 require probable cause for a search. *Terry* frisks and other intrusions upon an individual's personal security based on less than probable cause have been allowed not as a middle ground, but instead due to the "special needs" of law enforcement. *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring). The special-needs doctrine requires the court "to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." *Skinner,* 489 U.S. at 619, 109 S.Ct. 1402.

Finally, even applying the majority's rationale, I would conclude that the police had reasonable suspicion to justify a dog sniff of Carter's storage unit. The police were conducting an ongoing investigation into suspected drug dealing and firearms possession by Carter and his brother, both of whom had prior convictions and arrests for controlled substance and weapons offenses. Both of the brothers rented units at the storage facility; they sometimes were there several times a day; and sometimes Carter and his brother were seen together at Carter's storage unit. A few weeks beforehand, a BCA agent observed suspicious activity at the facility involving two cars, one of which was registered to Carter's brother. And only a few days before the dog sniff, Carter had again been allowed use of his storage unit after paying arrearages in rent.

For all of these reasons, I would affirm the conviction.