**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1356**

State of Minnesota,
Respondent,

vs.

Stuart Donald Luhm,
Appellant.

**Filed May 31, 2016
Affirmed
Johnson, Judge
Dissenting, Smith, John, Judge[*]**

Hennepin County District Court
File No. 27-CR-14-25896

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Joseph P. Tamburino, Caplan & Tamburino Law Firm, P.A., Minneapolis, Minnesota (for appellant)

Considered and decided by Kirk, Presiding Judge; Johnson, Judge; and John P. Smith, Judge.

## S Y L L A B U S

1. A person residing in a condominium unit in a secured, multi-unit condominium building does not have a legitimate expectation of privacy in the common areas of the building so as to challenge a police officer's warrantless entry into the building.

_____

[*]Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

2.      The area immediately outside the door of a condominium unit in a secured, multi-unit condominium building is not curtilage for purposes of the Fourth Amendment to the United States Constitution so as to preclude a law-enforcement officer from conducting a warrantless dog sniff in that area.

3.      The dog sniff conducted immediately outside the door of appellant's condominium unit in a secured, multi-unit condominium building was lawful under article I, section 10, of the Minnesota Constitution because the dog sniff was supported by a reasonable, articulable suspicion of criminal activity.

**O P I N I O N**

**JOHNSON**, Judge

Stuart Donald Luhm was convicted of various drug- and weapons-related offenses. He argues that the district court erred by denying his motion to suppress evidence that was found in his home, a condominium unit, based on a search warrant that was obtained after police officers entered a secured, multi-unit condominium building and used a drug-detection dog immediately outside the door of Luhm's unit. We conclude that the police officers' warrantless entry into the building was lawful because Luhm did not have a legitimate expectation of privacy in the common areas of the building and, alternatively, because the building's property-management company consented to the officers' warrantless entry. We also conclude that the dog sniff conducted immediately outside the door of Luhm's condominium unit was lawful because it was justified by a reasonable, articulable suspicion of criminal activity. Therefore, we affirm.

**FACTS**

In August 2014, Orono Police Officer Paul Hooper received a tip from a confidential informant that "Mindy" Steinmetz and her boyfriend, Luhm, were trafficking in large quantities of marijuana and recently had been robbed of approximately 25 pounds of marijuana and approximately $15,000 in cash. The informant provided Officer Hooper with a photograph of Steinmetz and Luhm, which had been obtained from facebook.com. Soon thereafter, Officer Hooper determined that Melinda Steinmetz and Luhm lived in a multi-unit condominium building in the city of Minnetonka. Officer Hooper conducted surveillance of the parking lot outside the building and saw vehicles registered to Steinmetz and Luhm there. Officer Hooper also learned that Steinmetz and Luhm had been arrested together in 2011 for fifth-degree possession of a controlled substance.

Officer Hooper requested that another law-enforcement officer use a drug-detection dog in the hallway outside the door of Steinmetz's and Luhm's condominium unit, which is on the third floor of a four-story building, which is part of a multi-building complex. Steinmetz rented the condominium unit from Luhm's mother, who owned the unit. The front door of the building customarily is locked. It appears from the record that no receptionist or guard is stationed at the front door. A visitor to the building customarily would gain entry by using a telephone system to contact a resident, who can remotely allow the visitor to enter by electronically unlocking the front door.

The Minnetonka Police Department had access to the interior of the condominium building because a key to the front door was stored inside a "Knox box" (a particular brand of locked keybox), which was attached to the wall in a foyer. All officers of the police

3

department had a key to the locked keybox. The property-management company of the building previously had made the front-door key available to the police department.

On August 29, 2014, Officer Heather Olson went to the condominium building with Officer Mark Meyer and a trained drug-detection dog, Brio, who had been trained by Officer Meyer to detect controlled substances. Officer Olson and Officer Meyer used the front-door key that was inside the locked keybox, entered the building, and went to Steinmetz's and Luhm's condominium unit on the third floor. There are approximately ten other units on the third floor. Officer Meyer directed Brio to sniff immediately outside the door of Steinmetz's and Luhm's condominium unit. Brio alerted in a way that, based on the dog's training, indicated that controlled substances were inside the condominium unit.

Later that day, Officer Hooper submitted an application for a warrant to search Steinmetz's and Luhm's condominium unit. The application was based on the information previously provided by the confidential informant, the information concerning Steinmetz's and Luhm's arrest history, and the result of the dog sniff conducted immediately outside the door of Steinmetz's and Luhm's condominium unit. A district court judge approved the application and issued the warrant. On September 2, 2014, police officers searched the condominium unit. They found large quantities of marijuana, 93 oxycodone tablets, 7 firearms, and 2 bullet-resistant vests.

The state charged Luhm with five felony offenses: (1) being an ineligible person in possession of a firearm, in violation of Minn. Stat. § 624.713, subd. 1(2) (2014); (2) third-degree controlled-substance crime, in violation of Minn. Stat. § 152.023, subd. 2(a)(3) (2014); (3) fifth-degree controlled-substance crime, in violation of Minn. Stat. § 152.025,

4

subd. 1(b)(1) (2014); (4) another count of fifth-degree controlled-substance crime, in violation of Minn. Stat. § 152.025, subd. 1(b)(1); and (5) commission of a crime while possessing a bullet-resistant vest, in violation of Minn. Stat. § 609.486 (2014).

In March 2015, Luhm moved to suppress the evidence obtained in the search of the condominium unit. In a memorandum of law, he argued that the officers' warrantless entry into the condominium building was unlawful and that the dog sniff was not justified by probable cause or reasonable suspicion. The state argued that a dog sniff in a common hallway of a multi-unit residential building is not a search that implicates the protections of the Fourth Amendment of the Unites States Constitution or article I, section 10, of the Minnesota Constitution. At a hearing on the motion, the state presented the testimony of Officer Hooper and Officer Olson. Luhm testified but did not call any additional witnesses. The district court denied the motion orally on the record. The district court reasoned that the police officers' warrantless entry was justified by the consent of the property-management company and that the dog sniff was justified by a reasonable, articulable suspicion of criminal activity.

In May 2015, the case was submitted in a stipulated-evidence court trial. *See* Minn. R. Crim. P. 26.01, subd. 4. The district court found Luhm guilty on all counts. The district court imposed concurrent prison sentences of 60 months on count 1, 60 months on count 2, and 17 months on count 5. Luhm appeals.

**ISSUES**

I.     Did Officer Olson and Officer Meyer violate Luhm's right against unreasonable searches by entering the secured, multi-unit condominium building without a warrant?

II.     Was the dog sniff conducted immediately outside the door of Luhm's condominium unit justified by information suggesting that Luhm was engaging in criminal activity?

**ANALYSIS**

Luhm argues that the district court erred by denying his motion to suppress evidence for two general reasons: first, that police officers unlawfully entered the secured, multi-unit condominium building without a warrant, and, second, that the dog sniff conducted immediately outside the door of his condominium unit was unlawful because it was not supported by probable cause of criminal activity.  If Luhm were to prevail on either argument, the subsequent search warrant would be invalid, and the evidence found during the execution of the search warrant would be suppressed.  Conversely, if the officers' warrantless entry and the dog sniff are valid, the search warrant also would be valid, and there would be no basis for suppressing the evidence found during the execution of the search warrant.

This court applies a clear-error standard of review to a district court's findings of fact concerning a motion to suppress evidence.  *State v. Bourke*, 718 N.W.2d 922, 927 (Minn. 2006).  If the underlying facts are not in dispute, we apply a *de novo* standard of

review to a district court's denial of a motion to suppress evidence. *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008).

## I.

Luhm argues that the district court erred by reasoning that Officer Olson's and Officer Meyer's warrantless entry into the secured, multi-unit condominium building was justified by consent, for three reasons. First, he contends that the property-management company did not have authority to consent to the officers' warrantless entry. Second, in the alternative, he contends that the property-management company exceeded the scope of its authority to consent by giving the officers an overly broad license to enter the condominium building. And third, he contends that the police officers' use of the key inside the locked keybox was not justified by an emergency.

In response, the state argues that the officers' warrantless entry is justified, for three reasons. First, the state contends that Luhm may not challenge the officers' warrantless entry because Luhm did not have a legitimate expectation of privacy in the common areas of the building. Second, the state contends that, even if Luhm had a legitimate expectation of privacy in the common areas of the building, the property-management company consented to the entry. Third, the state contends that, even if the property-management company did not have actual authority to consent to the officers' warrantless entry, the property-management company had apparent authority to do so.

**A.      Legitimate Expectation of Privacy**

We first consider whether Luhm had a legitimate expectation of privacy in the common areas of the secured, multi-unit condominium building so as to challenge the officers' warrantless entry into the building.

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Minnesota Constitution contains substantially the same language. Minn. Const. art. I, § 10. "[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580 (1979) (quotations omitted). Whether the Fourth Amendment protects a person from unreasonable searches may depend on the location of a search because the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 430 (1978). The concept that a defendant must be "able to show the violation of his (and not someone else's) Fourth Amendment rights" is similar to the concept of standing but "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 472 (1998) (quotation omitted).

The same principles apply to a defendant's right to challenge a search under article I, section 10, of the Minnesota Constitution. *State v. Carter*, 596 N.W.2d 654, 656 (Minn.

8

1999).  Minnesota courts apply a two-step analysis to determine whether a defendant has a legitimate expectation of privacy in a particular area.  *State v. Gail*, 713 N.W.2d 851, 860 (Minn. 2006).  At the first step, we ask whether the defendant "exhibited an actual subjective expectation of privacy in" a particular place.  *See id.* (quotation omitted).  At the second step, we ask whether that expectation of privacy is reasonable.  *See id.*

In this case, Luhm contends that he had a subjective expectation of privacy in the common areas of the multi-unit condominium because the building is secured and because the common areas are jointly or collectively owned and controlled by the persons who own the condominium units in the building.  Luhm's evidence in support of this contention is rather sparse.  We need not dwell on this issue, however, because the more difficult hurdle for Luhm to overcome is the requirement that his subjective expectation of privacy in the common areas of the building be reasonable.  *See id.*

Neither the United States Supreme Court nor the Minnesota Supreme Court has considered whether a resident of a multi-unit building has a reasonable expectation of privacy in the common areas of the building so as to challenge an officer's warrantless entry into the building.  The supreme court's opinion in *State v. Milton*, 821 N.W.2d 789 (Minn. 2012), is helpful because it involved a similar issue.  An officer investigating a murder found incriminating evidence in plain view in a common-area stairway in a residential duplex building.  *Id.* at 795-96.  The plain-view analysis required the court to determine "whether [the investigating officer] was in a legitimate position to view the [incriminating items] when she first saw them."  *Id.* at 799.  The supreme court reasoned that "a resident of a multifamily residence has a 'diminished' expectation of privacy in the

9

common areas surrounding the residence," which, the court noted, are "'not subject to the exclusive control of one tenant and [are] utilized by tenants generally and the numerous visitors attracted to a multiple-occupancy building.'" *Id.* (quoting *State v. Krech*, 403 N.W.2d 634, 637 (Minn. 1987)). The supreme court concluded that the investigating officer was legitimately present in the common areas at that time for purposes of the plain-view doctrine. *Id.* at 800-01. The supreme court's analysis in *Milton* lends support to the state's contention that Luhm did not have a reasonable expectation of privacy in the common areas of his multi-unit condominium building.

The state cites caselaw from federal appellate courts that have considered whether, under the Fourth Amendment, a resident of a secured, multi-unit residential building has a legitimate expectation of privacy in the common areas of the building so as to challenge an officer's warrantless entry into the building. The opinions cited by the state consistently hold that a resident of a secured, multi-unit residential building does *not* have a legitimate expectation of privacy in the common areas of the building and, thus, may not challenge an officer's warrantless entry into the building. *See, e.g.*, *United States v. Nohara*, 3 F.3d 1239, 1241-42 (9th Cir. 1993); *United States v. Acosta*, 965 F.2d 1248, 1252-53 (3d Cir. 1992); *United States v. Concepcion*, 942 F.2d 1170, 1172 (7th Cir. 1991); *United States v. Holland*, 755 F.2d 253, 255-56 (2d Cir. 1985); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977); *see also State v. Nguyen*, 841 N.W.2d 676, 679-82 (N.D. 2013); *State v. Talley*, 307 S.W.3d 723, 730-35 (Tenn. 2010).

Luhm has not challenged the state's reliance on these federal cases and has not cited any opinions to the contrary. Our independent research indicates that the caselaw cited by

10

the state reflects the majority view. It appears that only one federal circuit court of appeals has held that a resident of a secured, multi-unit residential building has a legitimate expectation of privacy in the common areas of the building. *See United States v. Carriger*, 541 F.2d 545, 552 (6th Cir. 1976). Other federal appellate courts, however, have criticized *Carriger* and recognized that it reflects the minority view. *See Nohara*, 3 F.3d at 1242; *Eisler*, 567 F.2d at 816.

Thus, in light of the supreme court's opinion in *Milton* and the federal caselaw cited above, we conclude that Luhm did not have a legitimate or reasonable expectation of privacy in the common areas of the secured, multi-unit condominium building so as to challenge the officers' warrantless entry into the building. This conclusion is a sufficient basis for rejecting Luhm's argument that Officer Olson and Officer Meyer unlawfully entered the secured, multi-unit condominium building without a warrant.

## B. Consent Exception

We next consider whether, assuming Luhm had a legitimate or reasonable expectation of privacy in the common areas of the building, the officers' warrantless entry is lawful on the ground that the property-management company consented to their warrantless entry.

In general, a warrantless entry into a residence is "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380 (1980). But a warrantless entry is lawful if it is justified by an exception to the warrant requirement, such as the consent of a resident or another person with authority to consent. *State v. Pilot*, 595 N.W.2d 511, 519 (Minn. 1999). Consent to a warrantless entry may be express or implied.

11

*State v. Othoudt*, 482 N.W.2d 218, 222 (Minn. 1992). Whether a person consented to a warrantless entry is determined "based on all relevant circumstances." *Id.*

In this case, the state introduced evidence that the property-management company of the condominium building provided the local police department with a key to the front door of the condominium building, which was kept in the locked keybox. According to the state's evidence, the property-management company did so to allow officers of the police department to enter the condominium building for "whatever the police need[ed]," whenever police officers deemed it necessary or appropriate for law-enforcement purposes. The district court considered this evidence and found that the property-management company thereby consented to the police officers' warrantless entry into the multi-unit condominium building.

Luhm does not dispute the fact that the property-management company provided the officers with a key to the front door of the condominium building. Rather, he contends that the consent was invalid because the property-management company did not have authority to consent to the officers' warrantless entry. In general, a person has authority to consent to a search if the person "possess[es] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 163, 171, 94 S. Ct. 988, 993 (1974). Common authority exists if there is "mutual use of the property by persons generally having joint access or control for most purposes," which makes it reasonable to believe that one person among several persons "has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7, 94 S. Ct. at

12

993 n.7.  Accordingly, a property manager may consent to a search of the common areas of a multi-unit residential building that are under the property manager's control.  *See United States v. Esparza*, 162 F.3d 978, 980 (8th Cir. 1998); *United States v. Elliott*, 50 F.3d 180, 186 (2d Cir. 1995); *United States v. Kelly*, 551 F.2d 760, 764 (8th Cir. 1977); *United States v. Kellerman*, 431 F.2d 319, 324 (2d Cir. 1970).

Luhm cites *State v. Licari*, 659 N.W.2d 243 (Minn. 2003), in which the supreme court concluded that a manager of a storage facility "did not have actual authority to consent to the search of [Licari's] storage unit."  *Id.* at 252.  The *Licari* opinion is distinguishable because the manager consented to a search of the interior of an individual storage unit, not a search of a common areas used by multiple tenants and under the control of the manager.  *See id.* at 250-52.

Luhm also contends that the property-management company's authority to consent to the officers' warrantless entry is limited by the condominium building's written rules and regulations.  Luhm points to a provision in that document stating that condominium residents have "exclusive use" of "limited common areas" of the building.  But that portion of the rules and regulations does not refer to the entryways or hallways of the building.  Rather, that provision refers to certain other areas, such as the parking garage, balconies, and storage lockers.

Luhm contends further that, even if the property-management company had authority to consent to the officers' warrantless entry into the building, the consent is invalid because of the broad, "blanket" manner in which it was given.  Luhm's contention may be relevant to the relationship between the building's residents and the property-

13

management company, but it does not undermine the fact that the property-management company actually gave consent to the police department. In addition, Luhm's contention fails in light of the state's invocation of the doctrine of apparent authority. A police officer may rely on a person's expression of consent if "the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S. Ct. 2793, 2801 (1990) (quotation omitted). In this case, the evidentiary record contains no reason for the officers to doubt that the property-management company had authority to consent to their warrantless entry into the multi-unit condominium building. Thus, regardless whether the property-management company had actual authority to consent to the officers' warrantless entry, the property-management company had apparent authority to do so, which justifies the officers' warrantless entry.

Thus, we conclude that the officers' warrantless entry into the common areas of the secured, multi-unit condominium building is justified by the consent of the building's property-management company. This conclusion also is a sufficient basis for rejecting Luhm's argument that Officer Olson and Officer Meyer unlawfully entered the secured, multi-unit condominium building without a warrant. Because consent is, by itself, a valid exception to the warrant requirement, we need not consider Luhm's argument concerning the emergency-aid exception to the warrant requirement.

## II.

Luhm next argues that the district court erred by reasoning that the dog sniff conducted immediately outside the door of his condominium unit was justified by a

14

reasonable, articulable suspicion of criminal activity. More specifically, Luhm argues that the officers needed probable cause of criminal activity. For this argument, Luhm relies on federal constitutional law, as expressed in the United States Supreme Court's opinion in *Florida v. Jardines*, 133 S. Ct. 1409 (2013). In response, the state argues that the dog sniff was not a search for purposes of the Fourth Amendment. The state also argues that, under state constitutional law, a reasonable-suspicion standard applies and that the officers had a reasonable, articulable suspicion of criminal activity before performing the dog sniff.

## A.  *Jardines* **Curtilage Analysis**

We first consider Luhm's argument that the dog sniff conducted immediately outside the door of his condominium unit was a search for purposes of the Fourth Amendment, which Luhm contends may be conducted only if the officer has probable cause of criminal activity.[1]

---

[1]The Supreme Court's grant of certiorari in *Jardines* was "limited to the question of whether the officers' behavior was a search within the meaning of the Fourth Amendment." 133 S. Ct. at 1414. After answering that question in the affirmative, the Court did not proceed to consider whether a law-enforcement officer must obtain a warrant before conducting a dog-sniff search or whether an officer may conduct a warrantless dog-sniff search with either probable cause or reasonable suspicion of criminal activity. *See id.* at 1417-18; *see also California v. Acevedo*, 500 U.S. 565, 581-85, 111 S. Ct. 1982, 1992-94 (1991) (Scalia, J., concurring) (reviewing caselaw concerning warrant requirement and exceptions to warrant requirement); *cf. State v. Davis*, 732 N.W.2d 173, 176 (Minn. 2007) (considering "the level of suspicion (probable cause or reasonable, articulable suspicion) necessary to sustain as constitutional the use of a narcotics-detection dog in the common hallway of an apartment building" under Minnesota Constitution). Our research has not revealed a federal circuit court opinion that has answered that question after *Jardines*. *Cf. United States v. Whittaker*, ____ F.3d ____, ____, 2016 WL 1426484, at *3 (7th Cir. Apr. 12, 2016) (noting but not answering question whether dog-sniff search outside apartment door requires reasonable suspicion, probable cause, or probable cause and warrant). For purposes of this appeal, we assume without deciding that the premise of Luhm's second argument is true, *i.e.*, that a law-enforcement officer may conduct a

15

In *Jardines*, the Supreme Court considered whether a police officer conducted a search for purposes of the Fourth Amendment when he used a drug-detection dog while standing on the open front porch of a detached, single-family home. 133 S. Ct. at 1413. The Court concluded that the dog sniff in that case was a search for purposes of the Fourth Amendment. *Id.* at 1414-17. The Court reasoned that the officer conducted the dog sniff within the curtilage of the home, *i.e.*, "the area 'immediately surrounding and associated with the home,' [which is] 'part of the home itself for Fourth Amendment purposes,'" *id.* at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742 (1984)), and which "is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened,'" *id.* at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213, 106 S. Ct. 1809, 1812 (1986)). The Court also reasoned that the officer's conduct within the curtilage of the home exceeded the license that impliedly is given to visitors who are permitted to approach a home and be present on a front porch. *Id.* at 1415-17.

Luhm seeks to establish that Officer Olson and Officer Meyer conducted a search immediately outside the door of his condominium unit by analogizing to *Jardines*. He contends, "The same logic with regards to the curtilage of houses applied in *Jardines* applies to a condominium building." More specifically, he contends that "the area immediately surrounding [his] condominium unit . . . constitutes the unit's 'front porch.'" He relies solely on the majority opinion in *Jardines*, which is based on the contours of a

---

warrantless dog-sniff search outside a residence if the officer has probable cause of criminal activity inside the residence.

16

particular space and a person's property rights in that space. *See id.* at 1414-17. He does

*not* rely on the concurring opinion in *Jardines*, which is based on the nature of certain

information and a person's expectations of privacy in that information. *See id.* at 1418-20

(Kagan, J., concurring) (relying on *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507

(1967), and *Kyllo v. United States*, 533 U.S. 27, 121 S. Ct. 2038 (2001)). In fact, Luhm

does not cite or rely on *Katz* and *Kyllo*. Luhm does not advance the theory on which the

*Jardines* concurrence is based.[2]

Whether a particular place is within the curtilage of a residence may be "determined

by factors that bear upon whether an individual reasonably may expect that the area in

question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300,

107 S. Ct. 1134, 1139 (1987). The Supreme Court identified four such factors:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*Id.* at 301, 107 S. Ct. at 1139. These factors are not a mechanistic formula but are "useful

analytical tools" so long as they "bear upon the centrally relevant consideration — whether

the area in question is so intimately tied to the home itself that it should be placed under

the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301, 107 S. Ct. at 1139-

---

[2]Accordingly, it is unnecessary for the court to analyze whether the dog sniff in this case violates *Katz* or *Kyllo*. To the extent that the dissenting opinion analyzes that issue, its analysis is not responsive to the arguments presented by the parties in this case.

40; *see also State v. Sorenson*, 441 N.W.2d 455, 458 (Minn. 1989); *Krech*, 403 N.W.2d at 636-37.

In this case, the first factor suggests that the area immediately outside the door of Luhm's condominium unit is curtilage because it is in close proximity to Luhm's home. But the second factor suggests that the area is not curtilage because there was no enclosure surrounding the area. The third factor also suggests that the area is not curtilage because Luhm did not have exclusive use of the area but, rather, shared it with other persons, including other residents of the third floor and their visitors. In fact, the record indicates that Luhm was especially limited in his ability to use that area in the same manner as he would use the inside of his condominium unit because the written rules and regulations of the condominium building state that "[h]allways are to be kept free and clear at all times of any personal property including, but not limited to: floor mats, rugs, footwear, carts, wheelchairs, walkers, etc." The fourth factor further suggests that the area is not curtilage because the area was fully visible to all persons who might walk by his door. Thus, the *Dunn* factors lead to the conclusion that the area immediately outside the door of Luhm's condominium unit is not curtilage. This conclusion is consistent with the overarching purpose of the curtilage doctrine, which is to determine "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301, 107 S. Ct. at 1140.

Luhm contends that, even if the area immediately outside the door of a *rented apartment* in a multi-unit *apartment* building is not curtilage, this case is different because the hallway outside his *condominium* unit was "owned by all residents of the condominium

18

of the building" and was "controlled and regulated exclusively by its owners." This contention fails for at least three reasons. First, Luhm cites no caselaw suggesting that the law of curtilage depends on whether a resident of a home owns the home or rents it from another person. The four factors identified by the Supreme Court give no regard to whether the resident of a home is an owner or a renter. *See Dunn*, 480 U.S. 301, 107 S. Ct. at 1139. Second, even if ownership were relevant, Luhm was not the owner of the condominium unit in which he lived. Third, even if ownership were relevant, and even if Luhm were permitted to assert his mother's ownership interest, the written rules and regulations of the condominium building indicate that each owner of a condominium unit has only a limited right to control the area immediately outside his or her condominium unit.

Luhm also contends that, even if the area immediately outside the door of a condominium unit in an *unsecured*, multi-unit residential building is not curtilage, this case is different because he lived in a *secured* building. The degree of security of a multi-unit residential building has limited relevance to the question whether a resident has a legitimate expectation of privacy in the area immediately outside the door of his or her residence. It is relevant to the extent that the curtilage analysis depends on whether the area is capable of being observed by persons who pass by the door. *See id.* But even in a secured building, numerous other persons may pass by a particular unit. In *Eisler*, the court rejected a similar argument on the ground that "[t]he common hallways of [the] apartment building were available for the use of residents and their guests, the landlord and his agents, and others having legitimate reasons to be on the premises." 567 F.2d at 816. Likewise, in *Concepcion*, the court reasoned that the common areas of a secured, multi-unit apartment

19

building "are used by postal carriers, custodians, and peddlers" such that "[t]he area outside one's door lacks anything like the privacy of the area inside." 942 F.2d at 1172. In short, the fact that the front door of Luhm's multi-unit building was locked does not significantly alter the curtilage analysis.

Thus, we conclude that the area immediately outside the door of Luhm's condominium unit was not within the curtilage of his home. Accordingly, Luhm cannot establish that the dog sniff that was conducted there was a search for purposes of the Fourth Amendment. *See State v. Williams*, 862 N.W.2d 831, 833-34 (N.D. 2015) (holding that area immediately outside door of condominium unit was not within curtilage under Fourth Amendment); *Nguyen*, 841 N.W.2d at 682 (holding that area immediately outside door of apartment was not within curtilage under Fourth Amendment); *but see People v. Burns*, ____ N.E.3d ____, ____, 2016 IL 118973, **7-10 (Ill. Mar. 24, 2016) (holding that landing outside door of appellant's apartment and one other apartment was within curtilage under Fourth Amendment); *State v. Rendon*, 477 S.W.3d 805, 810 (Tex. Crim. App. 2015) (same); *cf. Whittaker*, ____ F.3d at ____, 2016 WL 1426484, at **2-4 (relying on *Katz* and *Kyllo* for conclusion that warrantless dog sniff outside door of apartment was search for purposes of Fourth Amendment). Therefore, Luhm is not entitled to the protections of the Fourth Amendment with respect to the dog sniff conducted immediately outside the door of his condominium unit.

**B.      State-Law Analysis**

In light of our conclusion that the dog sniff in this case is not a search for purposes of the Fourth Amendment to the United States Constitution, we proceed to analyze the propriety of the dog sniff under the Minnesota Constitution.

In *State v. Carter*, 697 N.W.2d 199 (Minn. 2005), the supreme court concluded that, under the Minnesota Constitution, a law-enforcement officer may conduct a dog sniff outside an outdoor storage unit that is within a secured storage facility if the officer is lawfully present in the place where the canine sniff is conducted and if the officer has a reasonable, articulable suspicion of criminal activity. *Id.* at 212. Two years later, in *State v. Davis*, 732 N.W.2d 173 (Minn. 2007), the supreme court applied *Carter* to a dog sniff outside the door of an apartment in a common hallway of a multi-unit apartment building. *Id.* at 178-82. The supreme court noted that Davis did not introduce any evidence that the front door of the apartment building was locked or otherwise secured or any evidence that "access to the hallway or to the apartment building itself was limited." *Id.* at 179. The supreme court also noted that Davis did not make any argument "that the police were not lawfully in the hallway or in the apartment building itself." *Id.* Accordingly, Davis contended that the dog sniff conducted immediately outside the door of his apartment intruded upon "his privacy interest *inside* his residence." *Id.* at 179 (citing *Kyllo*, 533 U.S. at 29-30, 34-35, 121 S. Ct. at 2040-41, 2043). The supreme court concluded that Davis's reasonable expectation of privacy with respect to the *inside* of his apartment justified a

21

reasonable-suspicion standard for purposes of that case. *Id.* at 178-82 (interpreting state constitution).[3]

Whether the Minnesota Constitution requires a probable-cause standard or a reasonable-suspicion standard for a dog sniff "must be assessed based on the facts of each particular case." *See id.* at 178 (citing *State v. Olson*, 271 Minn. 50, 57, 135 N.W.2d 181, 186 (1965)). To make that assessment, a court must "balance[] 'the nature and significance of the intrusion on the individual's privacy interests . . . against the gravity of the public concerns [a dog sniff] serves and the degree to which the conduct at issue advances the public interest.'" *Id.* (quoting *State v. Larsen*, 650 N.W.2d 144, 148, 150 (Minn. 2002) (ellipses in original)). If there is both an intrusion on a legitimate expectation of privacy and a public concern, a court must ask "whether the level of intrusion upon [a person's] privacy interest . . . is sufficiently great that it can be said to render the search 'unreasonable' under the Minnesota Constitution unless it is supported by probable cause." *Id.* In *Davis*, this case-specific analysis led the supreme court to conclude that a reasonable-suspicion standard was appropriate for that case. *Id.* at 182.

In this case, the applicable balancing test requires that we first identify "the nature and significance of the intrusion on the individual's privacy interests." *Id.* at 178 (quotation

_____

[3]Contrary to the dissenting opinion, *Jardines* did not abrogate *Davis*. The majority opinion in *Jardines* was based on a property-rights theory. *Jardines*, 133 S. Ct. at 1414-17. In contrast, the opinion in *Davis* was based on a privacy-rights theory. *Davis*, 732 N.W.2d 179 (citing *Kyllo*, 533 U.S. at 29-30, 34-35, 121 S. Ct. at 2040-41, 2043). The concurring opinion in *Jardines* is, of course, not precedential. We further note that the supreme court considered *Kyllo* for purposes of the state constitutional analysis in *Davis* and concluded that the dog sniff was not a search requiring probable cause. *Davis*, 732 N.W.2d 178-79.

22

omitted). We stated above that Luhm did not have exclusive use of the hallway outside the door of his condominium unit. In fact, the written rules and regulations of the building forbade him from placing private property in that area. In analyzing whether that area is within the curtilage of his home for purposes of the Fourth Amendment, we noted that the area outside the door of his condominium unit was accessible to other residents of the multi-unit building. Those reasons also indicate that, for purposes of the state constitution, Luhm does not have a strong privacy interest in the common hallway outside the door of his condominium unit.

The applicable balancing test requires that we next identify "the gravity of the public concerns [a dog sniff] serves." *Id.* (quotation omitted). The public concerns in this case are essentially the same as the public concerns in *Davis*, which also involved suspicions of unlawful possession and sale of controlled substances. *See id.* at 175-76. In *Davis*, the supreme court stated, "We recognized in *Carter* that 'the government has a significant interest' in using narcotics-detection dogs in combating drug crimes and that the 'public's interest in effective criminal investigations' was served through the use of this investigative tool." *Id.* at 181 (quoting *Carter*, 697 N.W.2d at 211-12). The supreme court also stated, "Davis offers no argument that the government interest at stake here is not just as significant." *Id.* Similarly, in this case, Luhm does not argue that the state does not have an interest in investigating and prosecuting drug offenses.

The applicable balancing test requires that we last identify "the degree to which the conduct at issue advances the public interest." *Id.* at 178 (quotation omitted). In *Davis*, the supreme court stated:

23

> When we balance the minimal intrusion on Davis's privacy
> interests inside his residence against the governmental interest
> in the use of narcotics-detection dogs as an investigative tool
> to combat drug crime, we conclude that the police needed a
> reasonable, articulable suspicion to walk a narcotics-detection
> dog down the common hallway outside Davis's apartment.
> Use of the reasonable suspicion standard is consistent with this
> court's goals of preserving the "law enforcement utility" of
> narcotics-detection dogs and ensuring that the police are not
> allowed to use narcotics-detection dogs "at random and
> without reason."

*Id.* at 181-82 (quoting *Carter*, 697 N.W.2d at 211). We believe that the same analysis and conclusion is appropriate in this case.

Thus, we conclude that, in this case, a reasonable-suspicion standard applies to the dog sniff that was conducted immediately outside the door of Luhm's condominium unit.

## C. Application of Reasonable-Suspicion Standard

We last consider whether Officer Olson and Officer Meyer had a reasonable, articulable suspicion of criminal activity before the dog sniff was conducted immediately outside the door of Luhm's condominium unit.

In *Davis*, the supreme court described the applicable reasonable-suspicion standard as follows:

> Reasonable suspicion must be based on "specific and
> articulable facts which, taken together with rational inferences
> from those facts, reasonably warrant that intrusion." *Terry*,
> 392 U.S. at 21, 88 S. Ct. 1868. The requisite showing is "not
> high." *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S. Ct.
> 1416, 137 L.Ed.2d 615 (1997). We have said that reasonable
> suspicion requires "something more than an unarticulated
> hunch, and that the officer must be able to point to something
> that objectively supports the suspicion at issue." *State v.*
> *Wasson*, 615 N.W.2d 316, 320 (Minn. 2000). We consider the
> totality of the circumstances when determining whether

24

> reasonable suspicion exists, and seemingly innocent factors may weigh into the analysis. *State v. Martinson*, 581 N.W.2d 846, 852 (Minn. 1998).

*Id.* at 182.

In this case, the district court determined that the officers had a reasonable, articulable suspicion of criminal activity before conducting the dog sniff. On appeal, the state argues that a reasonable, articulable suspicion of criminal activity is based on the confidential informant's tip and on Luhm's and Steinmetz's common history of being arrested for possession of controlled substances.

Luhm contends that the confidential informant was "not reliable and provided no credible basis of knowledge to support his [or] her assertion that [Luhm and Steinmetz] traffic marijuana." The reasonable-suspicion standard may be "met based on information provided by a reliable informant" if the information provided bears "indicia of reliability that make the alleged criminal conduct sufficiently likely." *State v. Timberlake*, 744 N.W.2d 390, 393-94 (Minn. 2008). A confidential informant's reliability may be established if he or she "has given reliable information in the past" and if "the police can corroborate the information" provided by the confidential informant. *State v. Ross*, 676 N.W.2d 301, 304 (Minn. App. 2004). In this case, the affidavit supporting the search-warrant application indicates that the confidential informant had provided reliable information on multiple occasions during the preceding four months, including information that led to three controlled purchases. The officer's past experience with the confidential informant tends to make the confidential informant reliable. *See State v. Wiley*, 366 N.W.2d 265, 269 (Minn. 1985) (reasoning that prior successful use of confidential

informant supported reliability). In addition, the confidential informant's information was corroborated when Officer Hooper learned that Luhm and Stienmetz previously had been arrested together for possession of controlled substances.

Luhm also contends that there was "no information . . . that illegal drug activity may be taking place at the target residence." If a police officer is investigating a suspicion of drug-trafficking, it is "reasonable to infer that drug wholesalers keep drugs at their residences." *State v. Yarbrough*, 841 N.W.2d 619, 623 (Minn. 2014). In this case, the confidential informant stated to Officer Hooper that Luhm and Steinmetz recently had been robbed of approximately 25 pounds of marijuana and approximately $15,000, which suggests that Luhm may be in possession of relatively large quantities of controlled substances. This information is enough to give rise to a reasonable, articulable suspicion of criminal activity.

Thus, we conclude that the officers had a reasonable, articulable suspicion of criminal activity, which justifies the dog sniff that was performed immediately outside the door of Luhm's condominium unit.

# DECISION

In sum, the district court did not err by denying Luhm's motion to suppress evidence.

**Affirmed.**

**SMITH, JOHN**, Judge (dissenting)

The majority concludes that the front door of a condominium unit in a multi-unit building is not curtilage subject to Fourth Amendment protection and that a dog sniff of the seam of the front door only requires reasonable articulable suspicion of criminal activity. I respectfully disagree. In my view, the Supreme Court's decision in *Florida v. Jardines*, 133 S. Ct. 1409 (2013), abrogates *State v. Davis*, 732 N.W.2d 173 (Minn. 2007). A trained drug-detection dog permits officers to obtain information about the inside of a home. A dog sniff of the door seam was a search under the Fourth Amendment, regardless of whether it occurred in the common hallway of the condominium building. I would reverse because the officers needed probable cause to conduct the dog sniff, and the dog sniff was essential to probable cause to issue the search warrant.

The Fourth Amendment protects "persons, houses, papers, and effects." U.S. Const. amend. IV. The protection of the Fourth Amendment extends to the curtilage, which is the area immediately surrounding a dwelling. *United States v. Dunn*, 480 U.S. 294, 300, 107 S. Ct. 1134, 1139 (1987). In *Jardines*, the Supreme Court held that the front porch of a single family home is the curtilage because it "is the classic exemplar of an area adjacent to the home and to which the activity of home life extends." 133 S. Ct. at 1415 (quotation omitted). The majority relied on the Fourth Amendment's "property-rights baseline" to conclude that the government's use of a trained police dog to intrude on the porch, which is intimately connected to the activities of the home, was a search within the Fourth Amendment. *Id.* at 1417-18 ("That the officers learned what they learned only by

D-1

physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.").

I also believe that the purpose of the entry by the police, assuming it was impliedly consensual, was not merely to make a casual visit but was made with the express purpose of conducting a search. "The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. . . . Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* at 1416. It makes little sense that a person who owns or lives in a condominium building has less protection than those living in a private dwelling.

Although the majority in *Jardines* did not reach the privacy issue because it felt it was unnecessary, *see id.* at 1417, I mention it here to accentuate my concern with the majority viewpoint in this case  The concurring opinion in *Jardines* reached the same conclusion as the majority of that court but relied on privacy rather than property rights: the right to retreat into one's home "and there be free from unreasonable governmental intrusion," the right to prevent "police officers from standing in an adjacent space and trawling for evidence with impunity," and the "heightened" expectations of privacy "in the home and the surrounding area." *Id.* at 1418 (Kagan, J., concurring) (quotations omitted). The concurring opinion recognized that property and privacy concepts "align" when the home is involved. *Id.* at 1419. The only divergence between the property and privacy analysis is that *Kyllo v. United States*, 533 U.S. 27, 121 S. Ct. 2038 (2001), controls the privacy analysis. *Id.* In that case, the government aimed a thermal-imaging device at a private home from a public street to detect heat emanating from the home, which indicated

a marijuana grow operation. *Kyllo*, 533 U.S. at 29-30, 121 S. Ct. at 2041. *Kyllo* held that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search—at least where (as here) the technology in question is not in general public use." *Id.* at 34, 121 S. Ct. at 2043 (quotation omitted).

In *Jardines*, the concurring opinion's privacy analysis relied on *Kyllo* to conclude that using a trained drug-detection dog, which is "not in general public use," to discern the presence of drugs within a home "violates our 'minimal expectation of privacy'—an expectation 'that *exists*, and that is acknowledged to be *reasonable*.'" 133 S. Ct. at 1419 (Kagan, J., concurring) (quoting *Kyllo*, 533 U.S. at 34, 121 S. Ct. at 2043). This is true even when the police have committed no trespass in order to use the "device." *See id.* (noting that in *Kyllo* the police "committed no trespass" when they used the thermal-imaging device from a public street).

In *Davis*, the Minnesota Supreme Court considered whether a dog sniff in a common hallway of an apartment building violated article I, section 10 of the Minnesota Constitution. 732 N.W.2d 173. The supreme court concluded that the police were lawfully in the hallway, there was no evidence that the building was limited by a locked door, and Davis did not show "that he had an expectation of privacy in the common hallway in addition to that expectation of privacy he had inside his residence." *Id.* at 179. The supreme court reasoned that an apartment "tenant must expect that other people will lawfully be in the hallway and be able to smell odors emanating into the public space," and that walking a dog in the apartment hallway was a minimal intrusion because the dog could

only detect the odor of illegal narcotics emanating from inside of the residence. *Id.* at 180. "Accordingly, [the supreme court held] that the police needed only reasonable, articulable suspicion that Davis was engaged in illegal drug activity, rather than probable cause, to conduct the dog sniff in the common hallway outside Davis's apartment door." *Id.* at 182. The supreme court concluded that the police had reasonable suspicion that Davis had illegal drugs in his apartment. *Id.* at 183.[4]

In treating a dog sniff as a minimal intrusion, the Minnesota Supreme Court in *Davis* relied on *United States v. Place*, 462 U.S. 696, 707, 103 S. Ct. 2637, 2644-45 (1983), and *Illinois v. Caballes*, 543 U.S. 405, 409-10, 125 S. Ct. 834, 838 (2005). *Id.* at 179-80. But different privacy interests are at stake in those cases: *Place* involved a seizure of luggage, i.e. personal effects, located in a public place, and *Caballes* involved a dog sniff of a motor vehicle lawfully stopped for a traffic violation. *See Caballes*, 543 U.S. at 406, 125 S. Ct. at 836; *Place*, 462 U.S. at 699, 103 S. Ct. at 2640. The dog sniff in this case was of appellant's home. And both the majority and concurring opinions in *Jardines* draw a firm line at the home. *See Jardines*, 133 S. Ct. at 1414 (stating "the home is first among equals"); *see also id.* at 1419-20 (Kagan, J., concurring) (citing *Kyllo*, 533 U.S. at 34, 121 S. Ct. at 2043) (stating that using "sense-enhancing tool" to explore details of the home

---

[4] The court of appeals in *Davis* had also considered whether the dog sniff was a search under the Fourth Amendment and concluded that it was not because Davis did not have a reasonable expectation of privacy in the common hallway of the apartment building. *State v. Davis*, 711 N.W.2d 841, 845 (Minn. App. 2006), *aff'd*, 732 N.W.2d 173 (Minn. 2007). The supreme court did not consider whether the dog sniff was a search under the Fourth Amendment. 732 N.W.2d at 176 n.5.

that would not otherwise have been knowable is a search that is presumptively unreasonable without a warrant (quotation omitted)).

Additionally, the Minnesota Supreme Court distinguished the thermal-imaging device used in *Kyllo* from a drug-sniffing dog because the dog was only able to detect "the odor of illegal narcotics emanating from the inside of [the] residence." *Davis*, 732 N.W.2d at 179. Contrary to the state constitutional analysis in *Davis*, the Supreme Court makes no distinction between illegal and innocent activity when it comes to the home. For example, the majority and concurring opinion in *Jardines* do not distinguish between a thermal-imaging device and a trained drug-detection dog. *Compare Jardines*, 133 S. Ct. at 1417 (noting *Kyllo* was concerned with government use of devices to intrude on details of the home, and rejecting state's argument "that forensic dogs have been commonly used by police for centuries" as irrelevant), *with* 133 S. Ct. at 1419 (Kagan, J., concurring) (comparing thermal-imaging device, a "sense-enhancing tool," to a drug-detection dog because both are devices used to "explore details of the home" that would not otherwise have been apparent (quotations omitted)). Also, in *Kyllo*, the Supreme Court made no distinction between heat radiating off the home and surveillance inside the walls of the home. 533 U.S. at 35, 121 S. Ct. at 2044. Indeed, the Supreme Court acknowledged that "[t]he Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained." *Id.* at 37, 121 S. Ct. at 2045. "In the home, . . . all details are intimate details, because the entire area is held safe from prying government eyes." *Id.* (emphasis omitted).

In my view, the *Davis* court's interpretation of article I, section 10 of the Minnesota Constitution as authorizing use of a drug-detection dog in a common hallway of an apartment building based only on reasonable articulable suspicion affords Minnesota citizens less protection than the Fourth Amendment. "The Federal Constitution guarantees only a minimum slate of protections; States can and do provide individual rights above that constitutional floor." *Kansas v. Carr*, 136 S. Ct. 633, 648 (2016) (Sotomayor, J., dissenting). A state "may grant its citizens broader protection than the Federal Constitution requires by enacting appropriate legislation or by judicial interpretation of its own Constitution." *Danforth v. Minnesota*, 552 U.S. 264, 288, 128 S. Ct. 1029, 1046 (2008).

Because a trained drug-detection dog is not in general public use and was used by the police to "explore details of the home that would previously have been unknowable without physical intrusion," *Kyllo*, 533 U.S. at 40, 121 S. Ct. at 2046, I would conclude that the dog sniff in this case was a search requiring a warrant under the Fourth Amendment, even when conducted from the common hallway of appellant's condominium.

In the alternative, I would follow the analysis of other jurisdictions and conclude as a matter of law that the door seam of a condominium unit in a multi-unit building is within the curtilage of the residence and is protected by the Fourth Amendment. *See People v. Burns*, ___N.E.3d___, ___, 2016 WL 1165635, at *7-8 (Ill. Mar. 24, 2016) (concluding that landing in front of defendant's apartment was within curtilage, where apartment building was locked and not accessible to the general public); *see also State v. Rendon*, 477 S.W.3d 805, 810 (Tex. Crim. App. 2015) (concluding curtilage extended to front-door

threshold in semi-private landing of apartment home). The multi-unit condominium building in this case was secure and only accessible with a key. Additionally, in a condominium building, unlike in an apartment building, the owner of each unit has exclusive ownership and possession, as well as an undivided interest in the common areas. Minn. Stat. §§ 515.05, .06(a), (b) (2014).[5] I therefore conclude that because appellant had a property interest in the immediate area surrounding his door, the dog sniff of the door seam conducted with only reasonable articulable suspicion and without a warrant violated appellant's Fourth Amendment rights.

---

[5] The legislature also recognizes that doorsteps, stoops, perimeter doors and windows, and their frames "are limited common elements allocated solely to the unit or units served." Minn. Stat. § 515B.2-109 (d) (2014).